UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

SPYROS PANOS,

Defendant.

No. 18-CR-581 (KMK)

OPINION & ORDER

Appearances:

Spyros Panos
Otisville, NY
*Pro Se Petitioner*

Margery B. Feinzig, Esq.
Assistant United States Attorney
White Plains, NY
*Counsel for the United States of America*

KENNETH M. KARAS, United States District Judge:

Defendant Spyros Panos ("Defendant" or "Panos") has filed a *pro se* motion, pursuant to 18 U.S.C. § 3582(c)(1)(A), seeking compassionate release (hereafter "Motion" or "Mot.") (*See generally* Pet. ("Mot.") (Dkt. No. 185)).  Panos, who is incarcerated at the minimum security satellite camp at FCI Otisville ("Otisville Camp"), has served approximately 38 months of his 102-month sentence.  In his Motion, he claims that certain medical conditions, family circumstances, extraordinary rehabilitation, and conditions of confinement justify early release from prison.  For the following reasons, the Motion is denied.

I.  Background

A.  Factual Background

1. Criminal History

Panos has made a career of committing fraud.  As an orthopedic surgeon from 2006 to 2011, he engaged in a multi-million-dollar scheme to have his medical practice submit false insurance claims that inflated payments received from providers and patients.  (PSR ¶ 36.)[1] Aside from causing major financial losses, Panos's fraud left his patients in the lurch about what medical care they had received.  (App. Dkt. No. 51 at 84.)

Because of his extensive fraud and deception, Panos was forced to surrender his medical license in August 2013.  (PSR ¶ 10.)  Two months later, Panos pleaded guilty to an Information charging him with one count of health care fraud (these proceedings are referenced herein as the "2013 Case").  (Minute Entry for Proceedings Held on October 31, 2013 (13-CR-800); PSR ¶ 12.)  Undaunted by this conviction and the surrender of his license to practice medicine, Panos launched a new scheme to defraud medical peer review companies ("PRCs") by impersonating a licensed orthopedic surgeon practicing in Westchester County ("Doctor-1") and performing peer reviews.[2]  (PSR ¶ 10.)

---

[1] The Court's use of "PSR" refers to the Presentence Investigation Report prepared in connection with Panos's sentencing in this case, (see Final Presentence Investigation Report ("PSR") (Dkt. No. 120)); "Dkt." refers to an entry on the District Court's docket for this Case; "App. Dkt." refers to an entry on the Court of Appeals docket for this case, Appeal No. 22-3158. Citations to "Appx." refer to an Appendix, filed under seal, containing Panos's medical records. (See Mem. in Opp'n ("Opp'n") Ex. 1 ("Appx.") (Dkt. No. 207-1).)  Citations to materials filed in other related district court proceedings (including those filed connection with the 2013 Case before Judge Nelson Román) follow the same conventions but include the docket number of each case in an additional parenthetical.  Unless otherwise indicated, all citations are to the page numbers as generated by the Court's Electronic Case Filing system, which generally appear in the top-right-hand portion of the cited documents.

[2] PRCs arrange for licensed independent doctors to review patients' medical files— typically in connection with workers' compensation and other insurance claims—and opine

For example, as part of this scheme, Panos submitted the credentials of Doctor-1 to three PRCs in September 2013 without the doctor's knowledge or authorization. (*Id.* ¶ 12.) In fact, before the ink was dry on his guilty plea in the 2013 Case, Panos formed a limited liability company called Excel O—short for Excel Orthopedics—and listed his father-in-law as the company's registered agent and a building his brother owned in Brooklyn as its address. (*Id.*) Panos instructed the three PRCs to pay him through checks payable to Excel O and mailed to the Brooklyn address. (*Id.*)

And, from late 2013 and until the spring of 2014, Panos posed as Doctor-1, reviewing patient files from the three PRCs and drafting reports on the treatment of patients. (*Id.* ¶ 13.) This scheme yielded $239,000 in payments from the three PRCs. (*Id.*) Panos stopped performing peer reviews, but only because he had to serve the 54-month prison sentence imposed by Judge Román in the 2013 Case. (*Id.* ¶ 14.) Once he was released from prison to a halfway house in September 2016, Panos quickly picked up where he left off, resuming the fraudulent peer reviews. (*Id.* ¶¶ 14–15.)

From there, things only got worse. For example, from September 2016 until October 2017, Panos, again pretending to be Doctor-1 (and, needless to say, still without Doctor-1's knowledge or authorization), performed peer reviews for five companies that, in return, sent checks totaling more than $636,500 to Excel O's Brooklyn address. (*Id.* ¶¶ 15–16.) The checks were deposited into bank accounts maintained by Panos and his family. (*Id.* ¶ 17.)

---

on whether a recommended variance in treatment is appropriate. (PSR ¶ 11.) To become eligible to perform peer reviews, doctors must give PRCs information about their background and qualifications, including, among other things, their educational credentials, the states where they are licensed to practice medicine, and personal information, such as date of birth and social security number. (*Id.*)

### 2. From Arrest to Guilty Plea

Panos was arrested on April 10, 2018, and charged in a multi-count complaint with wire fraud, health care fraud, and aggravated identity theft, in violation of Title 18 United States Code, Sections 1343, 1347, and 1028A.  (Compl. at 1–2 (Dkt. No. 2); Dkt. No. 4 (minute entry for Apr. 10, 2018)).)[3]  Panos was indicted for these same charges on August 13, 2018.  (*See generally* Indictment (Dkt. No. 19).)  After rejecting early plea offers, Panos was scheduled to go to trial on May 11, 2020.  (*See* Dkt. No. 59 (Scheduling Order).)  Due to the Covid pandemic, however, trial was adjourned until November 2, 2020.  (*See* Dkt. No. 90 (Scheduling Order).)  Before the trial had been adjourned, and at the Court's direction, the Government produced the pre-marked exhibits it intended to introduce at trial as well as Jencks Act material, which was supplemented on a rolling basis.  (Dkt. No. 59 (Scheduling Order); Dkt. No. 69 (order granting request to adjourn initial April 3, 2020 deadline to produce exhibits by one week).)

Prior to the adjourned trial date, the Court scheduled a final pretrial conference for October 29, 2020.  (Dkt. No. 90 (Scheduling Order).)  On October 22, 2020, Panos's retained counsel, Lawrence Fisher, delivered to the Government a flash drive containing approximately 1,000 proposed defense exhibits.  (Dkt. No. 97 at 3 (Letter from Government to Court (Oct. 28, 2020)).)  On October 28, 2020, the Government objected to the admission of the proposed defense exhibits on the grounds that many of the exhibits were presented without documentation to establish their authenticity, that the defense refused to describe how the records were obtained, and that at least some of the exhibits were fraudulent.  (*Id.* at 3–5.)  In response, Fisher advised

---

[3] In the notes describing Panos's presentment to the Magistrate Judge, it appears that Panos's arrest date was erroneously written as April 10, 2017.  (*See* Dkt. No. 4 (minute entry for Apr. 10, 2018).)  Given that the proceedings were otherwise consistent with an April 10, 2018 arrest date, the Court assumes that this was a typographical error.

the Court and the Government that Panos wished to plead guilty.  (*See* Minute Entry for

Proceedings Held on October 29, 2020; *see also* Opp'n at 2 (representing that Fisher so notified

the Court and the Government on October 28, 2020); Hr'g Tr. 5 (Oct. 29, 2020 Hr'g) (Dkt. No.

105).)  Early that evening, the Government sent Fisher a letter, pursuant to *United States v.*

*Pimentel*, spelling out the Government's position regarding the applicable Guidelines range (the

"*Pimentel* Letter").  (Opp'n at 2 (government counsel representing same); *see also* Hr'g Tr. 5.)

The *Pimentel* Letter calculated a Guidelines range of 111 to 132 months' imprisonment.  (Opp'n

at 2–3; App. Dkt. 51 at 36.)  Within hours of receiving this letter, Fisher informed the

Government and the Court that he intended to move to be relieved as counsel due to an actual

conflict of interest.  (Opp'n to Mot. to Withdraw Plea 8 (Dkt. No. 110); App. Dkt. 51 at 36; *see*

*also* Hr'g Tr. at 2–5 (Fisher describing his notifying Court and apprising the Court of the

situation on the record).)  Later that evening, Fisher requested the Government to provide a plea

agreement.  (Hr'g Tr. at 6; App. Dkt. 51 at 36.)

On October 29, 2020, just before the final pretrial conference, the Government drafted a

plea agreement that contained a Guidelines calculation consistent with the Pimentel Letter and a

provision in which the Government agreed not to charge Panos with obstruction of justice in

connection with his preparation of fraudulent defense exhibits (the "2020 Plea Agreement").

(Dkt. No. 107-3 at 2-7; *see also* Hr'g Tr. at 6.)  The conference then became a hearing under

*United States v. Curcio* to determine whether Fisher had a conflict and whether, if so, it was

waivable.  (Hr'g Tr. at 18–50.)  After determining that Fisher had a potential conflict, the Court

explained the purpose of the *Curcio* hearing to Panos, and then conducted a thorough inquiry of

Panos.  (*Id*. at 19–20.)  Panos confirmed he understood Fisher's potential conflict, waived his

right to consult with different counsel, insisted he did not want a new attorney, and waived his

right to conflict-free counsel. (*Id*. at 25–27, 29–34, 35–37, 38–44, 45–46, 48.) The Court accepted Panos's waiver. (*Id*. at 59–62.)

After giving Panos an opportunity to talk to Fisher one more time, to make sure he wished to go forward with the plea, the Court conducted a guilty plea allocution. (*Id.* at 61–102.) During this allocution, Panos admitted that he "knowingly used another physician's identity to submit peer review reports and received money for that [activity]"; that he used the telephone and internet, as well as interstate communication, to carry out his fraudulent scheme; payment for this peer review work was approximately $876,389.97; he used a third party's identity to carry out the fraud; and he knew it was illegal to do so. (*Id.* at 98–100.) Panos also acknowledged that he was "not contesting the view that [he] attempted to obstruct or impede the administration of justice by submitting false documents for use at the trial." (*Id*. at 100.) The Court accepted Panos's guilty plea. (*Id.* at 101–02.)

3. Motion to Withdraw His Guilty Plea

 November 4, 2020, Fisher moved to be relieved, and the Court appointed Daniel Hochheiser, Esq. as new counsel for Panos. (Dkt. No. 100 (Letter from Lawrence Fisher, Esq. to Court (Nov. 4, 2020)); Dkt. No. 101 (Order appointing Daniel Hochheiser, Esq. as counsel).) On January 24, 2021, Panos, represented by Hochheiser, filed a motion to withdraw his guilty plea, claiming that his guilty plea was invalid due to ineffective assistance of counsel. (Mot. to Withdraw Plea (Dkt. No. 106); Mem. of Law in Supp. of Mot. to Withdraw Plea ("Plea Withdrawal Mem.") (Dkt. No. 108).) He also asserted, among other things, that he was innocent. (Plea Withdrawal Mem. at 21–25.) In a declaration in support of his motion, Panos claimed that he had pleaded guilty based on, inter alia, advice from Fisher that he would otherwise face additional charges for obstructing justice; he would lose at trial because he would not be able to introduce exculpatory evidence or have a computer forensic expert testify on his behalf due to

6

lack of funds; the Government would investigate his family members; he had not been given sufficient time to digest the conflict issue and the terms of the 2020 Plea Agreement, and had been operating under the assumption that the Plea Agreement he would receive would be identical to that offered to him two years earlier, in the summer of 2018; and he did not benefit from the 2020 Plea Agreement. (Def.'s Decl. in Supp. of Withdrawal Mem., Ex. 6 ¶¶ 13–14, 27, 30–31, 63–64 (Dkt. No. 107-6).) The Court denied Panos's motion. (Dkt. No. 114 (Order Denying Withdrawal Mot.).)

　　4. Post-Plea Misbehavior

Panos's sentencing was first scheduled for January 11, 2022, but was adjourned numerous times, after the Court granted adjournment requests by Panos. (*Id.*; Dkt. No. 126 (Order Adjourning Sentencing).) For example, on July 4, 2022, Panos requested an adjournment, supported by a letter from a health care provider, advising that Panos had been diagnosed with COVID-19 and was in quarantine. (Dkt. No. 128 (Letter from Daniel A. Hochheiser, Esq. to Court (July 4, 2022)).) The Court granted the request, adjourning the sentencing until July 20, 2022. (Dkt. No. 129 (Order Adjourning Sentencing).) On July 17, 2022, Panos made another adjournment request, this time supported by a note from a different health care provider indicating Panos was being treated for COVID-19 Pneumonia. (Dkt. No. 131 (Letter from Daniel A. Hochheiser, Esq. to Court (July 17, 2022)).) The Government, in response, asked the Court to order Panos to produce "laboratory results that substantiate the most recent claim of COVID-Pneumonia," which the Court did. (Dkt. No. 133 (Order Denying Adjournment).) On July 19, 2022, after Hochheiser submitted additional purported medical documentation, the Court adjourned sentencing until September 7, 2022. (Dkt. No. 134 (Letter

from Daniel A. Hochheiser, Esq. to Court (July 19, 2022)); Dkt. No. 135 (Order Adjourning Sentencing).)

A week later, the Government moved to revoke Panos's bail conditions, based on the claim that Panos lied about having COVID and COVID-Pneumonia and had filed false medical records with the Court in support of his requests for sentence adjournments. (Dkt. No. 141 (Order Granting Government's Motion).) The Court granted the motion and issued an arrest warrant. (*Id.*) On July 27, 2022, Panos was arrested and remanded and Hochheiser requested to be relieved as counsel. (Dkt. No. 137 (Letter from Daniel A. Hochheiser, Esq. to Court (July 27, 2022)).) The Court granted Hochheiser's request and appointed new counsel to represent Panos. (Dkt. No. 138 (Order Relieving Daniel A. Hochheiser, Esq.); Dkt. No. 139 (Order Appointing Ezra Spilke, Esq. as Counsel).)

5. Sentence

Sentencing took place on November 30, 2022. (Minute Entry for Proceedings Held on November 30, 2022.) At sentencing, the Court denied an "Omnibus Motion" that Panos filed on his own behalf. (App. Dkt. 51 at 64–65.) Among other things, the Court found that Panos's guilty plea foreclosed his Rule 12(b) motion and innocence claims. (*Id.* at 64.) As the Court noted, "Mr. Panos pled guilty, so all of his gripes, which are a repeat of a lot of the same things he said in connection with his motion to withdraw his plea, are resolved by the guilty plea. . . . He pled guilty under oath." (*Id.*)

In terms of the sentence itself, the Court adopted the Guidelines calculation set forth in the PSR and stipulated in the 2020 Plea Agreement, concluding that the applicable range was 111 to 132 months' imprisonment. (App. Dkt. 51 at 104–05.) In weighing the Section 3553(a) factors, the Court found that "the personal history and characteristics are fertile ground for

aggravation." (*Id.* at 105.)  In particular, the Court dismissed Panos's claims that he had been too trusting of others, explaining that it was Panos who "took advantage of other people who were too trusting." (*Id.* at 106.)  The Court also found that Panos's conduct was "brazen, arrogant, frightening, [and] dangerous." (*Id.* at 107.)  In concluding that a sentence within the Guidelines range was appropriate, the Court emphasized that the record demonstrated that Panos consistently tried to "weasel [his] way out of every responsibility, including being sentenced, by lying, lying, lying." (*Id.* at 112–13.)

After considering all the Section 3553(a) factors, the Court sentenced Panos to an aggregate term of 111 months' imprisonment, to be followed by three years' supervised release, and ordered Panos to pay $876,389.97 in restitution, $876,389.97 in forfeiture, and a $300 mandatory special assessment. (*Id.* at 112–13, 118.)

    6. Appeal and Post-Appeal

Panos appealed his conviction. (*See* Dkt. No. 156 (Not. of Appeal).)  Among other arguments, Panos claimed that his plea was involuntary because of Fisher's conflict, that the Court should have granted his *pro se* motion to dismiss the Indictment because of supposed "errors and violations" in the grand jury proceeding, prosecutorial misconduct, vindictive prosecution, and evidence that proved he was innocent. (*See generally* App. Dkt. 49, 61, 84.)  The Second Circuit rejected all of Panos's arguments and affirmed his conviction in a summary order. (App. Dkt. 114.)[4]

---

[4] On August 7, 2024, Panos moved *pro se* for a reduction in sentence under 18 U.S.C. § 3582(c)(2) and Amendment 821 to the U.S.S.G. § 1B1.10. (*See* Mot. for Application of Amendment 821 (Dkt. No. 175).)  He sought a sentence reduction through the retroactive application of U.S.S.G. Amendment 821, which took effect on November 1, 2023. (*Id.* at 3.) This motion relied on the portion of Amendment 821 that removed an additional criminal history point, commonly referred to as a "status point" for offenders, like Panos, who committed their offense while subject to a criminal justice sentence. (*Id.* at 3–5.)  The Government did not object

B. Procedural History

Panos has moved *pro se* for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), claiming the following reasons for release: (1) inadequate medical care; (2) the incapacitation of his family members and their alleged need for his assistance; (3) his rehabilitation and general positive impact on those around him, as demonstrated by, among other things, his "unprecedented Good Samaritan" acts and his exemplary prison record; and (4) the conditions of his confinement. (Mot. 9.) Panos also argues that a reduction is consistent with the Section 3553(a) factors because he has been "in full compliance with Court, pre-trial services and probation" orders since 2012, "has not received any . . . disciplinary sanctions in prison," and "complied with all administrative requests imposed by government agencies" although, he says, they subjected him and his family to "unnecessary punitive actions." (*Id.* at 64.) He also claims to have "paid his entire debt to society in his prior criminal case," which shows "significant respect for the rule of law"; he intends to provide guidance to those in prison and advocate for legislation to protect the plea process; he submits that other white collar criminal defendants received lower sentences and therefore deterrence would be served by reducing his sentence; he stresses his good character and deeds, which are reflected in letters of support; and, he says, he is non-violent and not a danger to the community. (*Id.* at 64–72.)

---

to a reduction to a sentence within the new Guidelines range. (*See* Dkt. No. 178 (Letter from Margery Feinzig, Esq. to Court (Aug. 16, 2024)).) Because Panos no longer received status points, his criminal history category was II, rather than III. (*See* Dkt. No. 180 at 7 (Order Granting Motion for Application of Amendment 821).) This resulted in an amended advisory Guidelines range of 78 to 97 months' imprisonment on Counts One and Two, to be followed by the mandatory consecutive 24-month sentence on Count Three. (*Id.*) The Court granted Panos's motion and reduced his sentence by nine months to 78 months' imprisonment on Counts One and Two, to be followed by 24 months' imprisonment on Count Three, for an aggregate sentence of 102 months' imprisonment. (*Id.*)

Not willing to wait for the Court to resolve his motion for compassionate release in the normal course, including allowing the Government reasonable time to collect, assemble, and analyze Panos's extensive medical records (and filings), (Dkt. No. 208 (Letter from Margery Feinzig, Esq. to Court (Sept. 30, 2025))), Panos filed a motion for Emergency Relief, claiming that he was in failing health and not receiving adequate or appropriate medical care. (Mot.; Dkt. No. 186 (Letter from Spyros Panos to Court (May 15, 2025)); Dkt. No. 197 (Letter from Spyros Panos to Court (July 24, 2025); Pet. For Immediate Release (Dkt. No. 201); Mot. for Emergency Relief (Dkt No. 205).) In particular, Panos claimed that he feared a recurrence of bladder cancer and that prison officials were not taking steps to diagnose and treat this illness. (Mot. 14–16.) On September 29, 2025, the Court denied the request for immediate release, noting that the cystoscopy that Panos demanded took place and established that Panos is not suffering from a recurrence of bladder cancer. (Dkt. No. 209 at 3 (Order Denying Emergency Relief).) The Court also noted its skepticism about Panos's vague claims of "progressively failing health," given his many fraudulent schemes (including two that resulted in felony convictions and his efforts to use doctored exhibits at his November 2020 trial) as well as his "long history of misrepresenting facts." (*Id.*) On October 16, 2025, Panos filed a Motion for Reconsideration of the Denial of Emergency Relief. (Mot. for Reconsideration (Dkt. No. 211).) This Order disposes both of the original § 3582(c) Motion and the Reconsideration Motion.[5]

---

[5] Panos also has filed a Petition, pursuant to 28 U.S.C. § 2255, to vacate his conviction and sentence. (Mot. to Vacate (Dkt. No. 181).) The Court will resolve that Petition in separate Opinion and Order.

11

## II. Discussion

### A. Standard of Review

Under 18 U.S.C. § 3582(c), the Court "may not" modify a term of imprisonment, except under very limited circumstances. One such circumstance is the compassionate release provision, which provides that a district court "may reduce the term of imprisonment" where, after considering the movant's claims and the factors set forth in 18 U.S.C. § 3553(a), it finds "extraordinary and compelling reasons warrant such a reduction" and determines "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A); *see also United States v. Halvon*, 26 F.4th 566, 568 (2d Cir. 2022) ("[Section] 3582(c)(1) permits a district court to reduce a term of imprisonment if 'after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable, it finds that extraordinary and compelling reasons warrant such a reduction.'") (quoting 18 U.S.C. § 3582(c)(1)(A)(i)) (alteration adopted).

Courts may consider "the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them." *United States v. Brooker,* 976 F.3d 228, 237 (2d Cir. 2020). The Sentencing Commission's relevant Policy Statement, set forth at U.S.S.G. § 1B1.13, identifies as "extraordinary and compelling" certain circumstances relating to a defendant's medical condition, age, family, prison abuse, and unusually long sentences, as well as any other circumstances of similar gravity. *See* U.S.S.G. § 1B1.13(b)(1)–(6); *United States v. Corbett*, No. 10-CR-184, 2023 WL 8073638, at *3 (S.D.N.Y. Nov. 21, 2023) ("The amended guidance from the Commission as to what constitutes extraordinary and compelling reasons now controls the analysis of a compassionate release petition, however initiated."). However, Congress did not define the terms "extraordinary" and "compelling." The Second Circuit has instructed, therefore, that defining those terms means considering "the ordinary, common-sense

12

meaning of the words" at "the time Congress enacted the statute." *United States v. Fernandez*, 104 F.4th 420, 427–28 (2d Cir. 2024) (internal citations and quotation marks omitted).  An "extraordinary" reason is "most unusual, far from common, and has little or no precedent," *id.* (citing *United States v. Jenkins,* 50 F.4th 1185, 1197 (D.C. Cir. 2022)) (alterations adopted and quotation marks omitted), "beyond or out of the common order, remarkable, and synonymous with singular," *id.* (citing *United States v. Escajeda*, 58 F.4th 184, 186 (5th Cir. 2023)) (same). "A 'compelling' reason 'is both powerful and convincing.'" *Id.* (quoting *United States v. Canales-Ramos*, 19 F.4th 561, 567 (1st Cir. 2021)).  The burden of showing that there are extraordinary and compelling circumstances to justify early release is on the defendant.  *See United States v. Jones*, 17 F.4th 371, 375 (2d Cir. 2021) (citing prior holding in *United States v. Butler*, 970 F.3d 1017, 1026 (2d Cir. 1992), that "the defendant . . . has the burden of showing . . . circumstances [that] warrant . . . decrease[d] punishment").

Even if a defendant establishes that extraordinary and compelling reasons may exist to make that defendant eligible for a sentence reduction, a court "may deny [a compassionate release] motion if, in its discretion, compassionate release is not warranted because § 3553(a) factors override . . . what would otherwise be extraordinary and compelling circumstances." *United States v. Israel*, No. 05-CR-1039, 2019 WL 6702522, at *2 (S.D.N.Y. Dec. 9, 2019). Again, "[t]he defendant bears the burden of showing that the circumstances warrant a sentence reduction." *United States v. Reynolds*, No. 20-CR-692, 2023 WL 3570668, at *1 (S.D.N.Y. May 18, 2023) (quotation marks omitted).

A compassionate release motion can be made by the Bureau of Prisons ("BOP") or by the defendant, but in the latter case only "after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of

30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A)(i).[6]

Finally, because Panos filed his motion *pro se*, the Court will construe it "liberally" "to raise the strongest arguments" it suggests. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (quotation marks omitted).

B. Analysis

   1. Medical Care

      a. General Overview

Panos claims he should be released early, in part, because of several medical issues. Specifically, Panos contends he is not receiving appropriate care for a possible recurrence of bladder cancer, not receiving hearing aids, not receiving sufficient care for chronic obstructive pulmonary disease ("COPD"), not being adequately monitored for high blood pressure, and not being treated for lower back and neck pain, gingivitis, weight gain, obesity, anxiety, or depression, and he further asserts a failure to receive a colon cancer screening. (Mot. at 7–20.) In support of these various claims, Panos relies on a selectively presented portion of his prison medical records (while the Government has provided the complete versions of such records) and

---

[6] Panos claims that he filed a written request for compassionate release with the Otisville Warden on July 3, 2024, and has attached a copy of a request and what he describes as "reminder" emails. (Mot. 6; Attachment to Mot. ("Panos's Ex.") 1–9 (Dkt. No. 185-2).) According to the Government, BOP has not been able to confirm receipt of Panos's submission. (Opp'n at 8.) To the extent Panos has not substantiated his assertion that he has exhausted his administrative remedy, and there are serious questions about whether he has done so, this failure could, by itself, be grounds to deny the Motion. However, the Government opposes the Motion on the merits and does not seek its denial on exhaustion grounds. (*Id.*) The Court will therefore assume, without deciding, that Panos has exhausted his administrative remedies and will decide the Motion on its merits. *See United States v. Haylock*, No. 19-CR-846, 2024 WL 4691023, at *6–7 (S.D.N.Y. Nov. 6, 2024) (assuming, without deciding, that a Section 3582 motion was exhausted and deciding it on the merits).

his own assertions.  (*See* Panos's Ex. at 17–19, 27–30, 35, 38–41, 48, 55–60; Appx. (Government's exhibit).)[7]

The Court will address each specific medical claim in more detail below, but there are a few broad observations that doom Panos's Motion.  To begin, many of the claimed medical conditions do not involve a risk of "serious deterioration in health or death."  U.S.S.G. § 1B1.13(b)(1)(C); *see United States v. Lembhard,* No. 17-CR-364, 2025 WL 968580, at *1 (S.D.N.Y. Mar. 31, 2025) (concluding that conditions such as long-term impacts of lead poisoning, and minor physical conditions such as high blood pressure and back pain were not extraordinary or unusual medical conditions that would meet the demanding criteria described in § 1B1.13(b)(1)).

Furthermore, contrary to his self-serving claims, Panos's medical records demonstrate that medical providers at Otisville have been responsive to his many complaints, including by performing numerous tests, providing treatment, and even transporting him to outside medical professionals for evaluation and care.  (*E.g.* Appx. 3 (note from offsite urology appointment), 5 (describing fitting for hearing aids and adjustment based on reported ongoing issues), 6 (note from offsite otolaryngology appointment), 55 (hearing evaluation note), 76 (blood test results); Letter from Margery Feinzig, Esq. to Court (Sept. 30, 2025), Ex. A 4 (Dkt. No. 208-1) (note from offsite medical appointment).)  *See United States v. Stewart*, No. 20-CR-83, 2024 WL 5046927, at *2 (S.D.N.Y. Dec. 9, 2024) (denying compassionate release motion where prison medical records demonstrated that the defendant's conditions were being addressed, including by outside providers); *United States v. Lewis,* No. 00-CR-1118, 2023 WL 4054508, at *2 (S.D.N.Y.

---

[7] In citations to the materials Panos attached to his Motion, the Court refers to page numbers as generated by the Court's Electronic Case Filing system, because the document does not itself contain page numbers.

June 16, 2023) (noting that "prostate cancer is not an unusual medical condition in the prison population, and the BOP is equipped to treat it and to arrange surgery when required"), *reconsideration denied,* No. 00-CR-1118, 2023 WL 5211310 (S.D.N.Y. Aug. 14, 2023); *United States v. Bradley*, No. 19-CR-632, 2023 WL 3004660, at *2 (S.D.N.Y. April 19, 2023) (denying compassionate release motion of a defendant who suffered from type-2 diabetes, high blood pressure, enlarged prostate, sleep apnea, obesity, nerve damage, urinary tract disorders and kidney damage, where health records demonstrated that BOP was monitoring and treating his health conditions). Indeed, the medical records demonstrate that Panos has been less than forthcoming about his medical conditions and how much he has shared with BOP officials about his conditions.

The last point, about the veracity of Panos's claims, merits a more robust discussion. The Court has serious concerns about Panos's credibility, given his multiple convictions for fraud (on a massive scale), some of which involved deceitful conduct after Panos had been convicted and sentenced for his first fraudulent scheme, his attempts to forge documents for use at trial in this case, and his demonstrably untrue statements to the Court throughout the history of this case. Panos takes umbrage with the Court's expression of this concern in his recently filed Motion for Reconsideration of the Court's denial of his application for emergency relief. (Mot. for Reconsideration.) In his submission, Panos claims that he has "improperly drawn the [Court's] ire," because of the Court's earlier expression of concern regarding Panos's credibility in denying the Emergency Release Motion. (*Id.* at 10.) Panos further claims that the Government is the party that is dishonest and that has "relied on insults and derogatory catch phrases," and that this Court "has been all too eager to jump on the bandwagon." (*Id.*)

16

According to Panos, it is unfair to question his credibility because "with the exception of the hasteful events which took place on October 29, 2020, [Panos] has NEVER misrepresented anything to the Court or other related parties." (*Id.*)  To be clear, the veiled reference "hasteful events" is, in fact, Panos's characterization of his being caught trying to doctor exhibits he intended to use at trial in this case.  In Panos's shaded view, for the Court to question his credibility based on a brazen and serious fraud on the Court, is somehow a "gaslighting" campaign against Panos. [8]  (*Id.*)  The Court strongly disagrees.  It is hardly a trivial matter that Panos forged documents to be used at his criminal trial—let alone gaslighting to mention this fact—especially when, at the time of the forgery, Panos faced charges of massive fraud and had already been convicted of committing a different type of medical fraud than was alleged in this case (and of which he ultimately was likewise convicted).  Indeed, in the spectrum of committing fraud on a court, forging documents for use at a trial is about as serious as it gets. *See United States v. Mills*, 987 F.2d 1311, 1318 (8th Cir. 1993) (affirming obstruction of justice enhancement when defendant used "cooked-up" documents in an attempt to "fool the jury");

---

[8] "Gaslighting" is defined as the "psychological manipulation of a person usually over an extended period of time that causes the victim to question the validity of their own thoughts, perception of reality, or memories and typically leads to confusion, loss of confidence and self-esteem, uncertainty of one's emotional or mental stability, and a dependency on the perpetrator." *See Gaslighting*, Merriam-Webster, https://www.merriam-webster.com/dictionary/gaslighting [https://perma.cc/BNM7-7SGQ] (last visited Dec. 29, 2025).  The term is tied to a 1938 play entitled *Gas Light*, which was adapted for film in the 1944 movie, *Gaslight*, starring Charles Boyer and Ingrid Bergman.  *See* Elissa Johnson, *Gaslighting Meaning*, Prevention (May 13, 2024), https://www.prevention.com/health/mental-health/a44373260/what-is-gaslighting/ [https://perma.cc/37QZ-FLLV].  The story tracks a male protagonist (Boyer) who convinces his wife (Bergman) that she's imagining things that are actually happening—including dimming the house's gas lights—which causes her to believe she is going insane.  *Id.*  Given that Panos has proven adept at manipulation of others through his various fraud schemes, which, among other things, has caused patients to be confused about whether their medical needs were being met, there is no shortage of irony in Panos claiming to be the victim of gaslighting in the face of the overwhelming evidence of his propensity for manipulation, fraud, and deception.

*Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978) (describing, as examples of "the most egregious misconduct" by litigants, "bribery of a judge . . . or the fabrication of evidence by a party in which an attorney is implicated"); *Colella v. Republic of Argentina*, No. 04-CV-2710, 2020 WL 4700930, at *8 (S.D.N.Y. Aug. 13, 2020) ("[T]he Court struggles to conjure examples of bad faith conduct by litigants more egregious than using fake documents to secure a judgment."), *aff'd*, No. 20-3031, 2021 WL 5895783 (2d Cir. Dec. 14, 2021) (summary order).

That Panos claims he committed this serious fraud only once does not mean it did not happen.  Nor does it mean that the Court is not well within its discretion to treat any unsubstantiated and/or self-serving claims by Panos to gain his release from prison with great skepticism.  *See Shahid v. Borough of Darby*, 560 F. App'x 152, 153 (3d Cir. 2014) (affirming district court's credibility determination premised, in part, on court's "conclusion that the invoice [the individual] produced in [the] case and the invoices he produced in an earlier case were fraudulent" (alterations adopted and quotation marks omitted)) (per curiam) (summary order); *Mei Chai Ye v. U.S. Dep't of Just.*, 489 F.3d 517, 526 (2d Cir. 2007) (noting that once an immigration judge determined that a party submitted a false "narrative" document, "it was appropriate for the [immigration judge] to find" that the "false document undermined [that party's] general credibility"); *Siewe v. Gonzales,* 480 F.3d 160, 170 (2d Cir. 2007) (affirming immigration judge's finding that the submission of a false document "redounds upon all evidence the probative force of which relies in any part on the credibility of" the party who submitted the false document); *Lee v. Comm'r of the Soc. Sec. Admin.*, No. 14-CV-11292, 2015 WL 4394275, at *7 (E.D. Mich. July 16, 2015) (approving of practice of relying on history of "offense involve[ing] an element of untruthfulness" in discounting credibility); *United States v. Miell*, 744 F. Supp. 2d 904, 939 (N.D. Iowa 2010) ("[Defendant] misses the significance of the

18

fraudulent conduct in which he engaged . . . including the use of forged documents . . . .  Where his claims . . . were systematically tainted with fraud, it is difficult, if not impossible, to give him any credit for parts of his claims that might have been legitimate . . . .").  And, Panos only adds to the Court's skepticism by claiming in his Reconsideration Motion that he is innocent, (Mot. for Reconsideration 9), notwithstanding that he admitted his guilt *while under oath*.  If he is truly innocent, then he lied under oath when he said he was guilty.  If he did not lie when he pled guilty, then he is now lying by proclaiming his innocence.[9]

So, to be clear, Panos—who has twice been convicted of massive medical fraud, who pretended to be a doctor under a different name after losing his own medical license, who undertook a desperate gamble to avoid a second trip to prison that relied on using fake documents at trial, and who says he is innocent even though he pled guilty—is offended that anybody might question his credibility when he makes unsubstantiated assertions to get out of jail.  He should not be protesting.  In light of these facts alone, and putting to the side the other issues discussed below, Panos's complaints about bandwagons and gas-lighting are overblown. They only add fuel to the questions about his credibility.  *See Hamlet*, act 3, sc. 2, line 242 ("The lady doth protest too much, methinks.").

b. Bladder Cancer

Panos has cited a number of claims of medical issues that, he says, justify his early release.  The most salient claim involves his assertion that he was exhibiting symptoms of a

---

[9] Panos has an answer to this: "[M]ulitple former patients of [his] who are judges[] have given up believing that the guilty plea reveals true culpability."  (Mot. for Reconsideration at 11.) Without identifying any of these judges/patients, Panos doubles down by identifying the "scripted plea colloquy" as "a big part of the problem."  (*Id.*)  In Panos's world, it is 'all too common for guilty pleas to be the product of risk avoidance at the expense of the truth, as was the case for [Panos] on October 29, 2020."  (*Id.*)  The Court is unaware of any judges who are on this bandwagon.

recurrence of bladder cancer, a condition which he experienced once before, with symptoms that began in 2009 or possibly 2007. (Mot. 7–8; Appx. 134 (noting 2009 diagnosis), 185 (health screening noting bladder cancer in 2007).) He was treated when he initially contracted the condition, including with chemotherapy in 2010, (*id.* at 7), and thereafter underwent cystoscopy at least three times, the last in 2010 or possibly 2016, which revealed that this "site was clean." (Appx. 192, 197, 220 (reflecting 2016 cystoscopy while in custody), 229.). As a result, it was determined that no further treatment was needed. (*Id.* at 229.) Panos asserts that in January 2024, he began having "recurrent hematuria and dysuria" (blood in his urine and difficult urination), which, he said, raised concerns about a recurrence of cancer. (Mot. 7–8.) Based on his claims, Panos insists that BOP should have immediately arranged for him to see a urologist and have a cystoscopy, but that BOP ignored his requests. (Mot. 8–9.)

However, his medical records tell a different story. In fact, prison health care providers ordered testing to determine if Panos had a recurrence of bladder cancer, the testing was done, and there was *no evidence of recurrence.* The sequence of events began on March 21, 2024, when Panos first reported to Dr. Alphonse Linley, M.D., Otisville's staff physician, that he was "feeling the same heaviness that he had" when he had bladder cancer. (Appx. 124.) Tellingly, the medical records reveal that Panos denied having frequent or painful urination and he denied having dysuria, hematuria, hesitancy, nocturia, urinary frequency, and urinary retention. (*Id.*)[10]

---

[10] Panos tells a different story. He claims that the record of the March 21, 2024 visit was inaccurate to the extent it indicated that he denied having dysuria and hematuria because he claims he told Dr. Linley during that visit that he was experiencing those symptoms. (Mot. 14–15.) In fact, on May 24, 2024, after he knew a cytology test showed blood in his urine, he emailed health services and asked for the March 21 record to be changed to indicate he told the doctor he had hematuria and dysuria. (Appx. 151.) The record was not amended. (Appx. 124.)

Moreover, Panos claims that during the March 21 visit, Dr. Linley diagnosed him with bladder cancer because he noted bladder cancer and an insurance code in the record. (Mot. 14.) This appears to be a decoy, as Dr. Linley would need to explain why a cytology would be

In response, Dr. Linley ordered diagnostic testing and, over the next several months, the following tests were performed:  On April 18, 2024, Panos had a cytology test (urine test), which came back "negative for High Grade Urothelial Carcinoma," and the results of which were reported on April 22, 2024.  (*Id.* at 142.)  He then had a CT scan, the results of which were reported on May 21, 2024, (*id.* at 154), and later received an MRI, the results of which were reported on September 13, 2024, (*id.* at 107).  None of these tests detected cancer.  The CT results showed Panos's bladder "was not distended," there was slight bladder wall thickening, and he had cysts in his kidney and liver.  (*Id.* at 154.)  The MRI confirmed the cysts in Panos's kidneys and liver.  (*Id.* at 107.)

While Panos claims that his "symptoms and bleeding have worsened and gone untreated for over 15 months now," (Mot. 16), during his visit with Dr. Linley on April 23, 2025, Panos said nothing about his supposedly worsening symptoms.  On the contrary, he told Dr. Linley he

---

needed, and merely noted it was to test for bladder cancer.  (*See* Appx. 125.)  Finally, Panos contends that Dr. Linley told him he had to see a urologist to have an "urgent" cystoscopy. (Mot. 15.)  However, the medical records (again) do not support this assertion, as the notes from the March 21 appointment indicate Panos was told that no further treatment was necessary at that time.  (Appx. 125.)  And, an email on May 1, 2024, to Panos made clear that "x-rays did not show significant abnormalities. The urine showed trace amount of blood. A CT was ordered for follow up due to your medi[c]al history of bladder cancer." (Appx. 157.)  A second email (on May 25) advised Panos that a urology consult was not ordered, the cytology urine test came back without evidence of urothelial carcinoma, a CT scan was recently completed, and an MRI was ordered for follow-up imaging. (Appx. 151).  Finally, a third email (on May 31) advised Panos that "[a] CT of the abdomen/pelvis was completed to see if urology was going to be indicated. The CT recommended you have an MRI.  We will have the MRI be completed for better findings and determine if urology consult is indicated."  (Appx. 150.)

As these records make clear, if nothing else, medical officials were diligently responding to Panos's various medical complaints, including by ordering the appropriate tests to determine if there was a recurrence of his bladder cancer.  The Court finds these records, which appear to be contemporaneously made by treating providers who had no incentive to misrepresent Panos's needs and treatment, to be more credible than the account from Panos, who has literally made hundreds of thousands of dollars from impersonating another doctor and falsifying medical records.

"periodically . . . still g[o]t blood in his urine." (Appx. 12.)  Nonetheless a urology consultation was recommended, (*id.* at 12, 67), and on June 23, 2025, Panos saw an outside urologist who recommended cystoscopy to rule out bladder cancer, (*id.* at 3, 84).  Panos had the cystoscopy on September 9, 2025, and it indicated that Panos does not have a recurrence of bladder cancer.  Specifically, the cystoscopy revealed there were no significant findings, and the results were negative for cancer recurrence. (*See* Letter from Margery Feinzig, Esq. to Court (Sept. 30, 2025), Ex. A 2 (Dkt. No. 208-1) (after cystoscopy, assessing Panos for condition other than cancer recurrence), 4 (noting "No Significant Findings"), 5 (reporting "Cystoscopy WNL" meaning "within normal limits," and suggesting follow up "in 3 months"), 8 (notes from cystoscopy).)  Panos was prescribed medication that is used to treat a benign condition. (*Id.* at 2, 5).[11]

---

[11] In his reply, Panos tries to turn the favorable testing results as presenting a "Catch-22." (Reply Br. 10 (Dkt. No. 212).)  Namely, he claims, if the "cystoscope is negative for bladder cancer, he requires further . . . treatment for other potential urinary tract cancers" and claims that he has "impeding irreversible kidney failure" that is not receiving adequate treatment. (*Id.*)  In support of the latter assertion, he points to evidence in the medical records submitted by the Government that there was worsening "3+ occult blood" in his urine as well as "1+ protein," which he characterizes as "a very ominous sign consistent with renal failure." (*Id.* at 9.)

While it is true that occult blood can be consistent with kidney failure, it is also true that this conduction can occur with more benign conditions, such as urinary tract infections, or can arise due to an enlarged prostate, a condition that was also noted in Panos's chart. (*See* Letter from Margery Feinzig, Esq. to Court (Sept. 30, 2025), Ex. A 8 (Dkt. No. 208-1).)  *See Blood in urine (hematuria)*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/blood-in-urine/symptoms-causes/syc-20353432 [https://perma.cc/JGS6-4ZE6] (last visited Jan. 2, 2026). (Other New York district courts regularly take notice of definitions from the Mayo Clinic in evaluating arguments involving medical information. *See, e.g.*, *Picarella v. United States*, No. 22-CV-4983, 2024 WL 1435744, at *2 n. 3 & n. 5 (E.D.N.Y. Apr. 3, 2024) (relying on definitions from Mayo Clinic's website); *Tention v. Comm'r of Soc. Sec.*, No. 21-CV-04659, 2023 WL 2868295, at *5 n.2 (E.D.N.Y. Apr. 9, 2023) (judicially noticing symptoms associated with condition as described on Mayo Clinic's website); *Graham v. Decker*, 454 F. Supp. 3d 347, 354 (S.D.N.Y. 2020) (relying on medical risk information from the same).  The Court concludes that taking judicial notice of the relevant entries on the Mayo Clinic website is appropriate here, too.)  Mildly elevated blood protein can occur, for instance, because a person is dehydrated, though it can also have more serious causes. *See High blood protein*, Mayo Clinic, https://www.mayoclinic.org/symptoms/high-blood-protein/basics/causes/sym-20050599 [https://perma.cc/FBM2-DW6R] (last visited Jan. 7, 2026).

22

Again, as the medical records conclusively demonstrate, contrary to his self-serving assertions, Panos is not suffering from "progressively failing health without any treatment instituted for his very serious medical conditions." (Dkt. 206 at 3 (Order dated Sept. 26, 2025).) Moreover, the records demonstrate, again contrary to Panos's unsubstantiated assertions, that his history of bladder cancer is being monitored and managed by medical professionals, including Otisville medical staff and, when necessary, outside health care providers. Therefore, Panos has failed to establish that his history of bladder cancer qualifies as an extraordinary or compelling reason for early release. *See United States v. Yeghoyan*, No. 20-CR-652, 2025 WL 2792569, at *5 (S.D.N.Y Oct. 1, 2025) (denying compassionate release motion of a defendant suffering from ulcerative colitis, "a medical condition that requires long-term or specialized medical care . . . without which the defendant is at risk of serious deterioration in health or death," because "medical records" revealed that the defendant had received the "necessary" treatment and was "routinely monitored by physicians") (quoting in part U.S.S.G. § 1B1.13(b)(1)(C)).

      c. <u>Hearing Loss</u>

Prior to serving his sentence, Panos had been diagnosed with "bilateral sensorineural hearing loss." (Mot. 17.) According to Panos, he has not been "allowed to use his hearing aids while in custody," (*id.*), and his request for new hearing aids had been denied, (*id.* at 18). He

---

Further, Plaintiff received an assessment of an enlarged prostate in September 2025 after he underwent cancer screening, was prescribed medication to treat the condition, and, as noted in his chart, was suggested to have a follow up within three months given the provisional nature of the diagnosis. (Dkt. No. 212 at 2, 5.) So far as the record shows, Panos's symptoms are being actively managed and monitored by providers, who have been working to identify the causes of those symptoms. The occult blood and protein in his urine, then, do not justify his release, given that they are being treated diligently by providers. *See United States v. Bradley*, No. 19-CR-632, 2023 WL 3004660, at *2 (S.D.N.Y. Apr. 19, 2023) (denying compassionate release where a "[d]efendant's health records indicate that the BOP is monitoring and managing his health conditions in an adequate manner").

also claims that hearing in his right ear has worsened and asserts, without any substantiation, that hearing in his left ear will "undoubtedly" worsen in the absence of hearing aids. (*Id.* at 17–18.)

Again, when the entirety of the medical records is reviewed, Panos's claims are not credible. The records show that Panos saw an outside otolaryngologist on August 28, 2024, (Appx. 56), the otolaryngologist medically cleared him for bilateral hearing aids, (*id.* at 100–02, 113–19), and BOP authorized him to get hearing aids by September 9, 2024, just a few days after his appointment, and suggested that he have a follow up appointment for a hearing aid fitting, (*id.* at 55). And, the records show, Panos accordingly had hearing tests with an outside audiologist on February 4, 2025, (*id.* at 20, 95, 99), and February 10, 2025, (*id.* at 95–98). On May 7, 2025, Panos returned to the outside otolaryngologist and was fitted for hearing aids in both ears. (*Id.* at 5, 6, 91.) Within weeks, Panos reported hearing improvement in his left ear, but not his right ear. So, a further hearing test was ordered. (*Id.* at 5.) The bottom line, however, is that Panos has hearing aids in both ears and any residual issues with his right ear are being addressed. While Panos argues that the delay in obtaining the hearing aids has caused his hearing loss to worsen, there is no corroboration for this assertion. In fact, Panos told Otisville health care providers that he had hearing loss for about thirty years and that he had been told in the past of "familial sensory neural hearing loss." (*Id.* at 99–100.) Thus, it is pure speculation for Panos to blame any alleged hearing loss on the delay for being fitted for his hearing aids.

In any event, any such claim that his hearing loss had gone untreated in the past would fall far short of qualifying as an extraordinary and compelling reason for early release given that he is indisputably receiving adequate care. *See United States v. Saleh*, No. 93-CR-181, 2020 WL 3839626, at *5 (S.D.N.Y. July 8, 2020) (denying motion for compassionate release, even though

24

the defendant's medical condition had deteriorated, because "BOP medical records illustrate that [the defendant] is receiving adequate care for his current medical conditions").

        d. <u>COPD/Covid</u>

Panos claims before he was in BOP custody in 2022, he had no history of "pre-existing pulmonary issues or diagnoses." (Mot. 19.) But, Panos says, he developed COPD because, while he was in federal custody, he was quarantined on two separate occasions "due to acquired COVID-19 infections with positive test results," even though he was "fully vaccinated." (*Id.*) His Covid quarantine took place in October 2022, which, he says, caused a delay in his sentencing. (*Id.*) After the second quarantine, Panos claims he had an appointment with Dr. Linley in March 2023, where it was noted that Panos faced an "increased risk of Covid 19 complications" due to "his prior history of infections and underlying medical conditions." (*Id.* (alteration adopted).) In August 2024, Panos asserts that he was "having shortness of breath and dyspnea on exertion," which led to a sick call at the clinic at Otisville on three separate occasions. (*Id.*) Eventually, Panos claims he was seen by a paramedic technician (and not Dr. Linley), who placed Panos on an Albuterol inhaler. (*Id.*) According to Panos, the inhaler was ineffective, which led to a telephone evaluation, during which Panos was diagnosed with COPD and "restrictive airway disease which was most likely secondary to pulmonary fibrosis due to COVID-19 exposure." (*Id.* at 19–20.) He was then purportedly placed on a second inhaler to manage symptoms. (*Id.* at 20.) Panos asserts that this diagnosis notwithstanding, he has not been evaluated by Dr. Linley (or any physician) and that his respiratory function "continues to worsen and remains significantly compromised." (*Id.*) In fact, before testing showed he had no recurrence of bladder cancer, Panos claimed in his Motion that his "rapid pulmonary

deterioration" may be "secondary to his underlying bladder cancer, which may have metastasized to affect his lungs." (*Id.*)

To begin, Panos presents no independent evidence that he ever had COVID-19 while in federal custody. His claims about the quarantine episodes do not provide that evidence. Indeed, Panos is careful about how he describes those quarantine episodes, saying that he was quarantined "due to acquired COVID-19 infections with positive test results." (*Id.* at 19.) While that language might suggest that Panos was diagnosed with COVID-19, the record, once again, proves Panos is not being truthful.

On October 13, 2022, Panos's attorney sent a letter to the Court requesting an adjournment of Panos's sentencing because Panos's unit was quarantined due to the fact that *another* inmate in Panos's unit had a positive COVID diagnosis. (Dkt. No. 144 (Letter from Ezra Spilke, Esq. to Court (Oct. 13, 2022)).) This quarantine prevented his counsel from physically visiting Panos in advance of sentencing or even scheduling video visits, and counsel had been unable to communicate with his client "during th[e] critical period" leading up to the scheduled sentencing. (*Id.*) Moreover, Panos has provided inconsistent descriptions about the cause of his bouts with shortness of breath. In an email to Dr. Linley on September 7, 2024, Panos claimed he had been having "difficulty with shortness of breath" the preceding week and that he had had "Covid 2 times in the past." (Panos's Ex. at 45.) However, when he first reported his breathing difficulties in the clinic on September 20, 2024, he said he had had an "unknown illness" about three weeks before, which might have been the flu. (Appx. 46.) But later, on December 3, 2024, Panos attributed his shortness of breath to COVID-19, reporting that "since having COVID-19, he has experienced residual effects of SOB . . . especially working as the unit orderly and in the garage." (*Id.* at 26.) The combination of these inconsistencies and the

26

medical records cast a long shadow over the veracity of Panos's claims about Covid and any connection to his purported breathing issues.

However, even if Panos is being truthful about having had COVID-19, there is no evidence in the record that shows that Panos has been diagnosed with COPD while in custody.[12] Moreover, Panos's health records are clear that healthcare professionals are regularly monitoring and treating his shortness of breath. After his first report of shortness of breath, diagnostic testing was ordered and an Albuterol inhaler prescribed. (*Id.* at 39.) On October 22, 2024, Panos had an ECG and a chest x-ray, which were described as unremarkable and "normal." (*Id.* at 104, 110.) An additional inhaler of Mometasone Furoate was prescribed in December 2024 to "decrease the need to use . . . [the] albuterol" inhaler. (*Id.* at 14, 27.) On May 28, 2025, Panos had a transthoracic echocardiogram which also reported normal findings and indicated there was "[n]o evidence of pulmonary hypertension." (*Id.* at 88.) Medical providers at Otisville also have run tests that measure Panos's air flow out of his lungs (Wright Peak Flow) and oxygen saturation in his arterial blood (SaO2 values). (*Id.* at 10, 24, 61–62.) And, as of the time that the Government filed its opposition, Panos was scheduled to have a pulmonary consult. (*Id.* at 4.)

Thus, added all up, Panos's self-serving assertions about his respiratory and pulmonary issues fall far short of justifying early release. Medical care providers have performed numerous diagnostic tests, including an ECG, a chest x-ray, and a transthoracic echocardiogram, and they all yielded normal results. Furthermore, his assertions notwithstanding, there is no evidence that Panos was diagnosed with COPD while in custody and, the record now makes clear, there is no basis to believe that a recurrence of bladder cancer metastasized "to affect his lungs." Even if

---

[12] There are two references to Panos self-reporting a history of COPD, but no indication of the reported phone evaluation for the condition that he describes. (*See* Appx. 9, 124.)

Panos had COPD, that condition does not present an extraordinary and compelling circumstance warranting a sentence reduction. *See United States v. Radulescu*, No. 19-CR-651, 2024 WL 4200388, at *1 (S.D.N.Y. Sept. 16, 2024) (concluding that defendant did not demonstrate extraordinary and compelling circumstances even where he had "moderate to severe asthma, emphysema (COPD), bronchiectasis, [a] heart condition, and use[d] . . . inhaled corticosteroids," where the inmate was also a longtime smoker, and reasoning that where courts order compassionate release for defendants with COPD, they have done so in light of "significant additional circumstances" supporting release), *reconsideration denied*, No. 19-CR-651, 2024 WL 5220421 (S.D.N.Y. Dec. 26, 2024); *United States v. Rodriguez*, No. 12-CR-790, 2024 WL 244379, at *4 (S.D.N.Y. Jan 23, 2024) (holding that an inmate with potentially undiagnosed COPD did not establish extraordinary and compelling reasons to justify a sentence reduction). And as with his claims about bladder cancer and hearing loss, Panos has not demonstrated that he is not receiving adequate care for his shortness of breath. He has been provided, on a timely basis, with inhalers, has been subject to a wide variety of testing, and is slated to see a pulmonologist.[13]

---

[13] In his reply, Panos continues to insist that he had Covid-19 twice, that prison officials have ignored his worsening symptoms, that the inhalers and have proven ineffective. (Reply Br. 14–16.) He offers no response to the various instances where the medical records disproved his initial assertions about Covid-19, COPD, his bladder cancer, and the numerous appointments and diagnostic testing that has been done to address Panos's concerns about his shortness of breath.

Panos also says that the reference to his being slated for a pulmonary consult was a typographical error by the treating provider that the Government inadvertently copied. (*Id.* at 15.) To be clear, the Court's decision is the same even if this is, in fact, a typographical error. Plaintiff simply has not demonstrated extraordinary circumstances where his conditions are being managed effectively.

e. Dental Care

Panos also seeks early release because of his claimed history of gingivitis, which he asserts was ignored by medical officials until February 2023. (Mot. 21.) He also claims that he has been given no preventative dental care in federal custody, and, as a result, Panos claims it "has become certain" that he will need major dental work down the road. (*Id.* at 21–22.)

As with Panos's other claims, the Court starts its evaluation of this assertion by reviewing the medical records. On July 27, 2022, when Panos was first remanded to Westchester County Jail ("WCJ"), he had a full health assessment that reported no dental issues. (Appx. 248.) In fact, the condition of his teeth and gums was reported as "normal." (*Id.*) A similar assessment was done when Panos was designated to Otisville in February 2023. The dentist who performed the assessment noted that other than bleeding gums, there were no identifiable dental issues, including, "toothache," "sensitive teeth," "loose teeth, or "tooth decay." (*Id.* at 230–31.)[14] However, the dentist also noted that Panos had poor oral hygiene. (*Id.* at 232, 239–40)

Given that medical professionals viewed Panos as presenting with unremarkable dental issues, it is unsurprising that he is on a list of inmates waiting to see a dentist for a regular check-up. (*Id.* at 151.)[15] In sum, the Court finds that Panos, relying on self-assertions that are

---

[14] While Panos claimed he had a history of bleeding gums, he denied he suffered from any dental conditions. (Appx. 230.) It also bears noting that when Panos saw an otolaryngologist for his hearing loss, she noted that his gums were "normal." (Appx. 101.)

[15] In his Reply, Panos seizes on this point, complaining that he has not had a teeth-cleaning in the three years that he has been in prison. (Reply Br. 17–18.) Again, he ignores the import of the medical records that contradicted his first round of assertions about gum bleeding and other dental maladies. Indeed, Panos, who is not a dentist, offers nothing to contradict the assessment of dentists who have examined Panos that it is sufficient that he is on a waiting list for a teeth cleaning. Because he has not offered any evidence that the absence of getting such a teeth cleaning has caused him a serious dental condition, he has not made out a case of extraordinary or compelling reasons for his early release from prison.

The Court notes further that Panos—who, it bears repeating, is not a dentist—makes the incredible claim that "[o]ral hygiene with brushing and flossing does not play any role in

29

contradicted by the medical records, has not come close to making the case that he suffers from dental issues that are extraordinary or compelling.

### f. Back Issues

Panos also asks for early release from prison because of back and neck pain. In particular, Panos asserts that this pain is the result of stenosis and radiculopathy that has worsened. To address this pain, Panos has asked to sleep on a lower bunk with a pillow and padding. (Mot. 22; Appx. 151; Panos's Ex. at 51.) He claims his complaints have been ignored, that he was denied the pillow, and that medical officials have never adopted a treatment plan. Thus, he claims to fear "[p]ermanent neurologic damage" due to lack of treatment and medical neglect. (*Id.* at 22–24.)

Once again, contrary to his assertions, Panos's complaints have not been ignored. Instead, the records show that prison officials engaged in diagnostic testing to determine if Panos was, in fact, suffering from some serious condition that was causing the pain of which he was complaining. The bottom line is that the testing showed that Panos was not suffering from some serious condition. Specifically, on April 2, 2024, prison officials took x-rays of Panos's cervical, thoracic and lumbar spines. (Appx. 158–59.) The results of these x-rays were that Panos was not suffering from any acute fracture or subluxation or that he had only "mild discogenic degenerative changes at a few levels of the mid to lower third segments of the thoracic spine."

---

causing, or preventing, gingivitis" and so contends that the Court should disregard the references in the record to his poor oral hygiene. (*Id.* at 17.) The Court will not do so, particularly because it is a well-known fact that "[t]he most common cause of gingivitis is not keeping your teeth and gums clean and healthy," and expert sources regularly advise that "[g]ood oral health habits, such as [tooth] brushing . . . [and] flossing daily" are key parts of "prevent[ing] and revers[ing] gingivitis." *See Gingivitis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/gingivitis/symptoms-causes/syc-20354453 [https://perma.cc/8SLU-RWJ7] (last visited January 2, 2026).

(*Id.* at 159.)  Medical officials shared the results of the x-rays with Panos via emails, advising him that the x-rays showed only mild changes, (*id.* at 151), and that the x-rays did not show significant abnormalities, (*id.* at 157).  He was also told Otisville would not provide him with the requested pillows as doing so was not indicated based on the testing, extra padding was not authorized, and he did not meet the criteria to guarantee that he would be able to sleep in a lower bunk going forward.  (*Id.* at 150–51, 165.)

Panos did not like this answer or the underlying x-ray results, so he claimed that the results actually showed "significant abnormalities."  How did he learn about these alternative results?  An unnamed "medical staff person in the pill line" told Panos that the tests, in fact, revealed "significant cervical, thoracic, and lumbar degenerative disc disease, spinal stenosis, facet anthropathy, and dextroscoliosis."  (Panos's Ex. 26 (note from Panos to medical staff stating that the "X-ray reports did show significant abnormalities as per the medical staff person during a recent pill line request").)  Panos believed the pill line medical staff person, because the supposed results shared by this anonymous staffer lined up with Panos's "subjective complaints and objective examination findings."  (*Id.*)  Given the choice between the clear evidence in the records about the results from the diagnostic testing or an individual about whom, for the reasons already described, the Court has serious credibility concerns, the Court finds the records to be persuasive.

To the extent that Panos is suffering from lower back and neck pain, the Court further concludes that these conditions do not rise to the threshold of being extraordinary or compelling reasons to justify early release from prison.  *See Lembhard*, 2025 WL 968580 at *1 (concluding that lower back pain is not an extraordinary medical condition that would meet the threshold of U.S.S.G. § 1B1.13(b)(1)).  Indeed, courts have found that even more chronic back conditions do

31

not qualify as extraordinary conditions, even when combined with other serious medical conditions. *See, e.g., United States v. Porcello*, 768 F. Supp. 3d 383, 386–87 (E.D.N.Y. 2024) (denying compassionate release where inmate had back surgery and suffered from coronary artery disease, hypertension, cardiac stents, and high cholesterol); *United States v. Fragoso*, No. 18-CR-179, 2021 WL 5205633, at *2–3 (E.D.N.Y. Nov. 9, 2021) (denying early release where the defendant had spinal cord and shoulder surgery, hypertension, high blood pressure, high cholesterol, elevated triglycerides, anxiety, and required physical therapy and a special bed after back surgery that had not been made available).  As Panos has not established anything close to a major back ailment, his motion for early release on this ground is denied.

g. Blood Pressure

Panos seeks early release based on claims of chronically high blood pressure, based on certain symptoms, including ringing in his ears, pain behind his eyes, and basilar headaches, which he says is not being properly treated by prison officials.  (Mot. 25). In particular, Panos claims that he has not had his blood pressure checked since April 2024, and that the medications he has been prescribed are not effective as demonstrated by his continued symptoms.  (*Id.*)

The Court is unpersuaded.  First, the records demonstrate that Panos has not reported many of the symptoms about which he now complains.  (Appx. 9–13, 26–27, 46, 56, 124–25, 177–79.)  In fact, he twice denied suffering from headaches.  (*Id.* at 124, 177.)  Second, while Panos had high blood pressure when he arrived at WCJ, the records show that he has been treated for it while in prison.  When Panos arrived at WCJ, his blood pressure was 138/78 and while it varied during his time at WCJ, he was treated with medication.  (*Id.* at 243–45, 247, 252–54.)  At Otisville, in February and March 2023, Panos's blood pressure was either within or below the normal range.  (*Id.* at 178, 181, 183, 195, 200.)  On March 21, 2024, Panos's blood

pressure rose to 148/88, so medical professionals prescribed a second medication, Amlodipine. (*Id.* at 125, 128.)  By April 23, 2024, as he has acknowledged, (Mot. 25), Panos's blood pressure dropped to 111/66.  As noted, Panos claims he has not had regular blood pressure checks since then, but this is untrue.  Medical professionals checked his blood pressure in May and September 2024.  (Appx. 10, 61, 128.)  And, in April 2025, his blood pressure was checked and was reported to be 131/82.  (*Id.* at 61.)  Thus, once again, the records establish that Panos is not being forthcoming about his blood pressure or the extent to which medical professionals have been checking and treating Panos for this condition.

Finally, high blood pressure is a treatable medical ailment, and thus not an extraordinary medical condition that would merit early release (at least, not without other exceptional circumstances not present here), especially where it is being treated.  *See Bradley*, 2023 WL 3004660 at *2 (denying early release where defendant suffered from type-two diabetes, hypertension, enlarged prostate, sleep apnea, obesity, nerve damage, urinary tract disorders and kidney damage); *United States v. Mood*, Dkt. No. 19-CR-113, 2020 WL 3256333, at *1 (S.D.N.Y. June 16, 2020) (denying compassionate release to defendant with diabetes and hypertension, where "[t]here is no question that [the defendant] has health issues, but his condition is stable and has been effectively managed by routine monitoring and medication"); *Lembhard,* 2025 WL 968580 at *1 (noting that treatable physical conditions such as high blood pressure and lower back pain not extraordinary or unusual medical conditions that would meet the threshold of U.S.S.G. § 1B1.13(b)(1)).

h. Obesity

Panos complains that he has become morbidly obese, is pre-diabetic, is at risk of adult-onset diabetes, and has not had a proper examination to address these conditions.  (Mot. 26.) The

medical records confirm that Panos has gained weight, but a blood test on June 10, 2025,

indicates his glucose was well within the normal range and his hemoglobin A1C was 5.8, which

is only slightly in the range of increased risk of diabetes, which spans from 5.7 – 6.4. (Appx.

76–77.) And, even if Panos is approaching obesity or diabetes, these conditions do not

collectively qualify as an extraordinary medical condition that the courts have determined to

justify early release. *See United States v. Cekaj*, No. 12-CR600, 2023 WL 4186050 *1–2

(S.D.N.Y. June 26, 2023) (denying motion for compassionate release that was based on, among

other medical conditions, diabetes); *Bradley*, 2023 WL 3004660 at * 2 (denying early release

motion of a defendant who suffered from type-two diabetes and obesity); *Mood*, 2020 WL

3256333, at *1 (denying compassionate release to defendant with diabetes and obesity). The

Court reaches the same conclusion and denies early release on the claim of obesity and diabetes.

> i. Colon Cancer Screening

Panos suggests that his release is justified because he is "significantly past due for

follow-up colon cancer screening." (Mot. 27.) Putting aside the fact that Panos admittedly "has

been told by the medical staff . . . that his screening will be ordered and performed" in due

course, the Court concludes that this delay, too, is insufficient to permit a finding of

extraordinary circumstances justifying release. Although there is no doubt that, in some

circumstances, the "[f]ailure to provide necessary treatment or undue delays in treating serious

medical conditions can present an extraordinary and compelling reason for compassionate

release," *United States v. Crish*, No. 18-CR-304, 2025 WL 3003925, at *2 (N.D. Ohio Oct. 27,

2025), the Court concludes that there has been no undue delay here, nor a delay that would pose

a life threatening and severe risk to Panos's health. Indeed, there is no evidence that Panos will

never get colon cancer screening—he merely protests that the time he has had to wait has

exceeded the recommended period.  He has not identified any harm that he has faced, nor is there any evidence that Panos has symptoms of colon cancer but, nevertheless, has been denied treatment.  *See id.* (concluding that, in the context of a single delay that had not caused additional harm, delayed skin cancer treatment did not constitute extraordinary reason justifying compassionate release); *United States v. Norman*, No. 17-CR-0315, 2023 WL 3984833, at *4 (N.D. Tex. June 13, 2023) (concluding year-long wait for follow up diagnostic visit, where there was "nothing in the medical records . . . submitted to the Court [that] indicate[d] . . . treating physicians suspect[ed]" moving defendant suffered from the disease defendant suspected she was experiencing, did not constitute extraordinary reason to grant compassionate release); *see similarly United States v. Sanchez*, No. 19-CR-360, 2022 WL 4181790, at *3 (S.D.N.Y. Sept. 13, 2022) (concluding that delayed surgery due to scheduling issues was not "extraordinary and compelling reason for release").

### j. Depression

Finally, Panos claims to have a history of recurrent and episodic depression and is now suffering from depression, new onset anxiety, heart racing, interrupted sleep, night sweats, and loss of interest in his usual daily routine.  (Mot. 27.)  Specifically, Panos asserts that his current mental health challenges are the result of his anxiety over the failure to diagnose and treat his various other medical conditions and that these untreated conditions may deny him the chance to complete his sentence and see his family.  (*Id.*)  Yet, according to the medical records, Panos has not reported these symptoms to health professionals or requested treatment for depression and anxiety.  (Appx. 9–10 (noting mood and affect within normal limits), 27 (noting affect within normal limits), 45–46 (no mental health related symptoms noted), 56 (noting "[n]o [a]pparent [d]istress"), 124 (noting no "[m]ood [i]pair[ment], [a]nxi[ety], [s]leep [i]mpair[ment]" or other

psychological symptoms and noting psychiatric condition "within normal limits"), 177–78 (same).)  In fact, during a consultation with Dr. Linley on April 23, 2025, Panos *denied* suffering from psychiatric issues including anxiety, sleep impairment, nightmares, hallucinations, and suicide/self-harm thoughts and his general psychiatric state was observed to be within normal limits.  (Appx. 9–10.)  Given his silence to his treating providers, there is no basis for Panos to complain about any failure to treat conditions that were unknown to medical professionals.  And that silence in the context of his medical treatment casts further doubt on the veracity of his claims to this Court.

Putting aside the insufficient factual basis to believe either that Panos is suffering from major depression or that medical professionals are failing to treat any such depression, it bears noting that courts have concluded that mental health conditions, such as depression, do not constitute extraordinary and compelling reasons justifying early release from prison.  *See, e.g., United States v. Sierra*, No. 10-CR-416, 2024 WL 1834081, at *4 (S.D.N.Y. Apr. 26, 2024) (concluding that the defendant's "serious bout with depression" was not sufficient reason to reduce his sentence, and collecting cases).  And, so it is here.  Panos has neither established that he currently suffers from major depression or that prison officials are failing to address any such depression.  Thus, this claim fails.

The Court further concludes that, even viewing the various medical conditions that Panos has alleged in the aggregate, those asserted medical issues do not constitute extraordinary circumstances.  *See United States v. Gomez*, No. 18-CR-214, 2025 WL 1400066, at *2–3 (E.D.N.Y. May 14, 2025) (concluding that the plaintiff's health issues including well-treated asthma and hypertension, anxiety, and lower back issues did not constitute extraordinary and compelling circumstances); *United States v. Wiggins*, 472 F. Supp. 3d 23, 24 (W.D.N.Y. 2020)

36

(concluding anemia, abnormal glucose, prostate cancer, and leg swelling, even when viewed together and during the peak of the COVID-19 pandemic, did not constitute extraordinary and compelling circumstances).  The Court reaches this conclusion due to grave doubts about Panos's veracity, the strong record evidence that he has received ongoing, largely effective treatment for the various conditions that he identifies, and, the fact that, to the extent that the record does support that Panos has experienced some of the asserted conditions, and to the extent that some of those conditions could be treated through treatment methods other than those Panos has received, those conditions are not ones that involve a risk of "serious deterioration in health or death."

### 2. Family Circumstances

Panos seeks early release to care for his mother and in-laws.  (Mot. 32–35.)  As for his 91-year-old father-in-law, Panos claims he suffers from, among other things, Alzheimer's, and requires "round-the-clock" care, and his 84-year-old mother-in-law cannot care for her husband and, in fact, will soon need round-the-clock care.  (*Id.* at 32–34.)  Panos also claims that his mother (who is 87 years old) has "serious health issues" that require constant care.  (*Id.* at 34–35.)  Panos also claims that he is the only person who can care for his in-laws because his wife works full-time and their children are unavailable to assist as they are in school.  (*Id.* at 32–33.)  He also asserts that he is the only person who can look after his mother, as his brother has a full-time job and children, and does not have the "patience, compassion or skill" to care for his own mother.  (*Id.* at 34.)

The Court does not doubt that Panos's imprisonment has created numerous challenges for his family, as that is a natural and foreseeable consequence of incarceration, but he has fallen short of establishing that these family circumstances qualify as extraordinary or compelling

reasons to justify an early release.  To gain early release, the Guidelines require that family circumstances rise to the level of "extraordinary and compelling" where the death or incapacitation of a family member would render the imprisoned defendant as the *sole* caregiver of an immediate family member.  *See* U.S.S.G. § 1B1.13(b)(3)(A)–(D); *see also United States v. Rodriguez,* No. 20-CR-513, 2024 WL 1464661, at *3 (S.D.N.Y. Apr. 4, 2024) (finding defendant failed to establish extraordinary and compelling circumstances when the defendant did not "explain why, apart from inconvenience, some combination of . . . relatives could not sufficiently attend to his mother's medical needs").  To establish both that the family members are in need of care and that the moving defendant is the sole available caregiver, the courts generally "require . . . evidence from several sources indicating that the defendant is the only available caregiver for a family member in dire conditions." *United States v. Lindsey*, No. 13-CR-271, 2021 WL 37688, at *3 (S.D.N.Y. Jan. 4, 2021) (quotation marks omitted); *see also United States v. Garcia*, No. 01-CR-1110, 2025 WL 1004409, at *3 (S.D.N.Y. April 3, 2025) (same).

Applying those rigorous requirements here, Panos has failed to justify his early release. To begin, Panos has not established that his relationship with his in-laws is such that they qualify as "immediate family members" under § 1B1.13 (b)(3), which permits compassionate release where defendant claims to be the "only caregiver" of a minor child or child incapable of self-care, of a spouse or registered partner, of a parent, or of an "immediate family member" or similar relation.  However, even assuming that his in-laws qualify as "immediate family members," *see United States v. Medas,* No. 20-CR-255, 2024 WL 2080999, at *4 (N.D. Ohio May 9, 2024) (assuming, without deciding, that defendant's father-in-law "qualifies as an 'immediate family member'"), Panos offers no independent corroboration for the claims that his in-laws and mother are incapacitated and/or that he is the only one who can provide for their

care. These claims can be rejected on that basis alone, and the Court so rejects those claims, especially given the serious questions about Panos's credibility. *See United States v. Diaz*, No. 10-CR-277, 2024 WL 3228347, at *6 (E.D.N.Y. June 27, 2024) (denying compassionate release application based on defendant's mother's asserted medical condition, which was supported only by the defendant's affidavit rather than medical records or a note); *United States v. Romano*, 707 F. Supp. 3d 233, 237–38 (E.D.N.Y. 2023) (denying release based on family circumstances where defendant did not demonstrate that household members, friends, or distant relatives would not have the capacity to care for the defendant's father); *United States v. Pabon*, No. 17-CR-312, 2021 WL 603269, at *4 (S.D.N.Y. Feb. 16, 2021) (denying motion for compassionate release where the defendant failed to establish that he was his wife's only caretaker given that he presented "solely his own unsubstantiated assertions" as to the relevant facts); *United States v. Yoda*, No. 15-CR-95, 2020 WL 5502325, at *3 (S.D.N.Y. Sept. 11, 2020) (denying compassionate release motion where the defendant had several siblings who could provide care).[16] Indeed, the record makes clear that Panos is not the only person who can provide care. Panos's wife and children live with his in-laws and, while Panos claims that they are too busy

---

[16] Panos claims that the PSR and other evidence in the record provide the necessary corroboration that he is the only possible caregiver. (Mot. 35.) In fact, the PSR reveals that Panos and his wife were getting divorced because their relationship was "dissolving" due to his crimes. (PSR ¶¶ 49–50.) This information, if anything, contradicts his self-serving assertion that he is the only one who can care for his in-laws. And, at his sentence, Panos acknowledged that his daughter did not want to have his name anymore and he had "lost complete respect from [his] children," (App. Dkt. 51 at 99), an assertion that undermines the likelihood he would return to the house that, according to the PSR, his children share with his in-laws and his wife. (PSR ¶ 52.) Finally, Panos's claims about his brother's inability to care for their mother are not corroborated and are based primarily on his own, self-serving assessment of his brother's personality traits. (*See* Mot. 35 (contending that his brother lacks the necessary personality traits and abilities to provide his mother with the requisite care).) In the meantime, Panos's admission that his brother lives near their mother, (Mot. 34), further undermines his claim for early release based on the assertion that Panos is the sole individual who could provide care for his mother.

working and going to school, (Mot. 32–33), those circumstances do not establish extraordinary and compelling reasons requiring a reduction in Panos's sentence. *See Lindsey*, 2021 WL 37688, at *3 (denying request for compassionate release based on the plaintiff's assertion that his mother was "ailing," his girlfriend, who cared for his minor child, was incapacitated, and his girlfriend's mother was intermittently hospitalized, because the defendant failed to provide evidence that no other family member or other caretaker could care for relatives). The record yields the same conclusion that Panos's brother, who lives near their mother in Brooklyn, can care for her, regardless of his other duties as a parent and regardless of any unsubstantiated assertions about the brother's disposition. (Mot. 34–35.) While "external commitments of [a defendant's] family members might make caretaking difficult, that is merely the inevitable circumstance families face when a family member is incarcerated, not an extraordinary and compelling reason to reduce a sentence." *United States v. Sanchez*, No. 01-CR-74, 2022 WL 4298694, at *3 (S.D.N.Y. Sept. 19, 2022) (quotation marks omitted); *see also United States v. Vailes*, No. 16-CR-297, 2020 WL 3960505, at *3 (E.D.N.Y. July 13, 2020) ("There is no question that a defendant's incarceration is painful and burdensome to family members, who must bear the stress of managing their lives without the defendant's help. It is an unfortunate fact, however, that these burdens are common to almost all families of incarcerated people, and do not constitute extraordinary or compelling factors."). Accordingly, Panos's request for early release on the grounds of family circumstances is denied.

3. Good Samaritan Acts, Prison Record, and Post-Sentence Rehabilitation

Panos claims that his behavior in prison, which includes teaching and taking classes, a relatively clean disciplinary record, and engaging in what he describes as good Samaritan acts, establish his post-conviction rehabilitation and support his early release. (Mot. 36–53, 62–63.)

Many of Panos's claims of good deeds and Samaritan Acts are backed up by letters he has submitted as part of his Motion. Some describe medical care Panos supposedly has provided to other inmates, (*e.g.* Panos's Ex. at 77), while others describe classes Panos said he taught or advice he provided to them, (*id.* at 81). Still others generally describe him as a peacemaker and an all-around amazing person. (*See id.* at 110 ("Spyros transcends [the social scene at Otisville] and is a 'Universal Leader' respected by everyone.").) The Court notes that in his short time in prison, Panos apparently has had the opportunity to treat a wide variety of serious medical issues. For example, one inmate claims that Panos saved his life twice while they were held at the same facility. (*Id.* at 73–75.) In this letter, the other inmate (who is described as "AB" in Panos's motion, but whose name is revealed in the attached letter) explains that he is a doctor and describes about how he "had heard nothing but great things about [Panos] from [his] fellow colleagues." (*Id.* at 73.) According to AB, while Panos practiced medicine in only Dutchess County, he "treated many patients from [AB's] community [in Westchester County] who would travel to see [Panos] in Dutchess County." (*Id.* at 73.) According to Dr. AB, when he was transferred from MDC to Otisville, he experienced abdominal pain, but somehow did not recognize this as a potential sign that he was suffering from appendicitis. (*See id.* at 74.) It was Panos who identified the appendicitis and was able to get Dr. AB the medical care he needed. (*Id.*) AB claims that the physicians who ultimately treated his appendicitis at an outside hospital "told [him] that [he] was not likely to make it without prompt medical care" based on his "age

41

and co-morbidities." (*Id.*) And, after AB returned to Otisville, Panos was again able to recognize post-surgical complications and, for the second time, save Dr. AB's life by ensuring he was brought to the emergency room for treatment. (*Id.* at 74–75.)

Putting aside Panos's demonstrated proclivity to create fake documents, which calls any letter he submits into question, the Court notes its specific concerns about AB's credibility. The Court knows full well who AB is because AB was sentenced by this Court. (*See generally* Hr'g Tr. (Dec. 1, 2022 Hr'g) (Dkt. No. 28) (21-CR-544).) Among the many yellow flags about AB's credibility is the fact that his medical license was revoked after his conviction for fraud in 1998. (*See* PSR ¶¶ 9, 14 (Dkt. No. 24) (21-CR-544).) Given that he cannot have legitimately practiced medicine for the better part of three decades, his claims about his colleagues' views about Panos are highly suspicious. According to the PSR in his case, AB defrauded New Jersey Medicaid to the tune of $313,000 through the submission of laboratory claims that he knew contained false information. (*Id.* at 7.) AB also has other convictions, one for fraud in 1989 and two for being a felon in possession of a firearm, (*id.* at 4, 6, 7) and has multiple arrests for assault and "Terroristic Threats," in connection with allegations of domestic violence brought by AB's wife, (*id.* at 8–9). Also, when he was arrested in connection with his second felon-in-possession case in 2021, AB had a business card bearing a variation of his name and the title "MD," even though he had lost his license over two decades earlier, and numerous vials of blood specimens with individuals' names on them. (*Id.* at 5.) This conduct may explain why AB and Panos have become such good friends.

Panos also submits another letter from somebody he describes as a "middle-aged attorney." (Mot. 48.) In this letter, the lawyer describes Panos's "great ability to connect with his audience," and how much of a "caring person" he is who "looks to help whoever he can with

42

whatever he can." (Panos's Ex. at 107.)  That middle-aged lawyer is Darren Ofskink.  (*Id.*)

However, Mr. Ofsink is no longer a lawyer, having been disbarred in 2018 after his conviction

for conspiracy to commit securities fraud in the Eastern District of New York.  *See Matter of*

*Ofsink*, 85 N.Y.S.3d 450, 451 (App. Div. 2018); *see also United States v. DiScala*, No. 14-CR-

399, 2018 WL 1187394, at *2 (E.D.N.Y. March 6, 2018) (describing Ofsink's role in the

fraudulent scheme and how he and his co-conspirators made at least $3,000,000 from the

scheme).  The Court thus takes anything Mr. Ofsink says about Panos with a giant grain of salt.

There are too many letters to do a thorough background check on all their authors, but the

Court notes that they do share a pattern of hyperbolic praise of Panos.[17]  He is lauded as

---

[17] Even a half-hearted research effort demonstrates that Panos relies heavily on those convicted of fraud to support his claims of magnanimous prison conduct.  Adolph DiDario wrote a letter, included as Exhibit 62, proclaiming that Panos should "be out in the community," because he can provide "so much positivity in our world which is filled with negativity." (Panos's Ex. at 102.)  Unfortunately, it appears Mr. DiDario himself contributed to some of that negativity by committing bank fraud.  (Judgment (Dkt. No. 58) (19-CR-876, D. N.J.).) Christopher Kraft wrote a letter, attached as Exhibit 63, where he claimed Panos taught two inmates how to read. (Panos's Ex. at 103.)  Mr. Kraft met Panos while serving a sentence following his conviction of honest services fraud.  (Judgment 1 (Dkt. No. 350) (20-CR-521).) Mark Varacchi drafted a letter that is attached as Exhibit 67, where he also claimed, among other things, that Panos taught another inmate to read.  (Panos's Ex. at 108–10.)  Mr. Varacchi was convicted of securities fraud and conspiracy to commit securities fraud in this District in 2022. (Judgment (Dkt. No. 46) (17-CR-76).)  Thomas Pacilio, whose letter is included as Exhibit 61, describes Panos as "a true gem and asset to any community." (Panos's Ex. at 101.)  Mr. Pacilio was convicted of tax fraud, having failed to report over $1.4 million in income.  (Information 10 (Dkt. No. 3) (22-CR-255, D. Conn.); Judgment (Dkt. No. 41) (22-CR-255, D. Conn.).)
     The Court recognizes, of course, that any inmate who might have first-hand knowledge of Panos's prison conduct would have to have been convicted of some crime and the Court certainly believes that individuals serving federal prison sentences can be credible, and often are. Moreover, the number of supporting letters could, in different circumstances, add force to an inmate's claim of rehabilitative prison conduct.  But where, as here, such letters are disproportionately written by a roster of convicted fraudsters, the stacking of those letters has no such effect.  *Cf. United States v. Otufale*, 740 F. Supp. 3d 233, 247–48 (E.D.N.Y. 2024) (permitting introduction of a witness's multiple convictions, because any "aggregate prejudicial effect" from such admission would be outweighed by the probative value of the witness's "past convictions involving dishonesty, deception, and disrespect for the law. . . ."); *United States v.*

43

somebody who "feels it is his obligation to give back to these people who may not have had the opportunities that he has had," (Mot. 48), who, "[w]hen tempers flare, . . . always rises to action and uses his calming influence and demeanor to settle people down," (*id.* at 47), who, apparently notwithstanding his own medical ailments, including obesity, has worked out with another inmate "every day" to help that inmate lose 90 pounds, (*id.* at 48). To sum it all up, one inmate writes: "I have worked in public service for over 25 years. I have encountered people from all walks of life and can honestly say that Spyros is, by far, one of the most admirable people I have ever met. He goes out of his way to comfort those who need comforting, to help those in need and to act as a guardian angel to keep them out of trouble." (*Id.* at 49.) That praise, by the way, came from a "public servant" who was convicted of wire fraud for his participation in a scheme to steal thousands of dollars from a town's COVID relief fund. *See United States v. John Trasacco*, No. 22-CR-33, 2023 WL 2758300, at *1 (D. Conn. Apr. 2, 2023). Regardless, the Court is expected to believe from these letters that Panos, who has demonstrated a clear patten of selfishness, deception, and greed when not in prison, has suddenly become some combination of Mahatma Ghandi, Mr. Rogers, and Saint Giuseppe Moscati since his imprisonment in this case— all based on the word of people who tried to make millions through lies and deception. The undisputed evidence casts too much doubt to believe in this overnight conversion.

In any event, while Panos's prison conduct, if it is to be believed, is commendable, the Guidelines provide that "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B.13(d) (Amended Policy

---

*White*, No. 08-CR-682, 2009 WL 4730234, at *5 (E.D.N.Y. Dec. 4, 2009) ("[S]ince felony convictions are probative of dishonesty, additional convictions suggest greater dishonesty.").

Statement).[18] The law expects good behavior from all inmates and thus it is unsurprising that

courts have held, for example, that participating in prison programming does not qualify as being

extraordinary and compelling.  *See, e.g.*, *United States v. Pouryan*, No. 11-CR-111, 2025 WL

521379, at *4 (S.D.N.Y. Feb. 18, 2025) (reasoning that completion of dozens of BOP programs,

a defendant's educational and religious transformation, and his genuine remorse were in line

with expectations and not extraordinary); *United States v. McCoy*, No. 18-CR-132, 2024 WL

1672363, at *5 (D. Conn. April 18, 2024) (holding that prison classes, supportive letters from

inmates, and expression of remorse, while all "admirable," did not justify early release, either

alone or in combination with other asserted bases for release); *United States v. Bennett*, No. 15-

CR-95, 2022 WL 3445349, at *3 (S.D.N.Y. Aug. 17, 2022) ("[P]articipating in the RDAP

[rehabilitative programming] and taking GED courses does not ascend to extraordinary and

compelling reasons that warrant early release."); *United States v. Needham*, No. 06-CR- 911,

2022 WL 19769, at *4 (S.D.N.Y. Jan. 3, 2022) ("[R]ehabilitation through participation in prison

programs and religious organization does not constitute an 'extraordinary and compelling'

justification for release."); *United States v. Vaughn*, No. 17-CR-89, 2021 WL4755071, at *2

(S.D.N.Y. Oct. 12, 2021) ("Making good use of one's time and obeying the rules in prison . . . is

expected.").

Aside from the suspicious letters, discussed above, the Court is skeptical about Panos's

claims of rehabilitation.  To begin, Panos, to this day, has exhibited an utter lack of remorse, let

---

[18] The same policy statement explains that rehabilitation may be considered "in combination with other circumstances," U.S.S.G. § 1B.13(d), but, for the reasons laid out in this Opinion, the Court does not think any of the other circumstances Panos describes can be credited and therefore, even viewing his asserted rehabilitation alongside his other claimed bases, does not conclude that Panos has demonstrated extraordinary and compelling circumstances warranting his release.

alone acceptance of responsibility, as demonstrated in his reconsideration motion. In that motion, Panos claims his innocence and seeks to blame the criminal justice system for his guilty plea, during which he admitted, under oath, his guilt. (*See* Mot. for Reconsideration 9.) He makes these claims, even after his previous motion to withdraw his plea and arguments on appeal were all rejected. (*See generally* Dkt.) Panos cannot have it both ways: He cannot claim he wants to make up for his crimes by rehabilitating himself through BOP programs and caring for others, while at the same time insisting he committed no crimes. Why try to rehabilitate when he has done nothing illegal? The question answers itself and thoroughly undermines his claim for early release. *See United States v. Siraj*, No. 05-CR-104, 2023 WL 2569398, at *2–3 (E.D.N.Y. Mar. 20, 2023) (rejecting a defendant's request for early release buttressed by letters of support, a record of extensive coursework, a clean disciplinary record, and positive influence on fellow inmates, where claims of innocence, "made not once, but multiple times, contradict[] his assertion that he has accepted responsibility for his actions, and raise[] serious questions about the extent of his rehabilitation" (footnote omitted)); *see also United States v. Henry*, No. 13-CR-91, 2020 WL 3791849, at *3 (E.D.N.Y. July 6, 2020) ("Henry's rehabilitation argument is undermined by the fact that Henry has never accepted responsibility for his offense and has continued to challenge aspects of his criminal case even after his post-trial motions and appellate arguments were roundly rejected.").

Another reason to doubt Panos's conversion is that the Court has seen this movie before. After his first fraud conviction, Panos also took numerous classes (over 50), totaling approximately 650 hours, and he had no disciplinary record. (PSR ¶ 36.) By doing so, Panos received good time credit and early release. Yet, despite taking all those classes and keeping his nose clean while in prison, it was clear that Panos was not rehabilitated at all, given his

46

fraudulent conduct in this case, which began almost immediately upon his release from prison. In fact, it appears that the lesson Panos has learned is to double down on giving the *appearance* of being rehabilitated.  He believes he can earn good time credit and, in this case, early release.

In the end, even the combination of rehabilitation, good deeds, and a clean disciplinary record are wholly insufficient to justify early release.  They are, to put it bluntly, not genuine, let alone extraordinary and compelling.[19]

### 4. Prison Conditions

Finally, Panos claims that the Court should release him from prison because he has been subjected to harsh conditions at WCJ, the MDC, and Otisville Camp.  (Mot. 54–61.)  Regarding WCJ, he asserts he got COVID and was quarantined (twice), that he was mistreated by other inmates and staff, that was given substandard food, and that he was subjected to poor ventilation and other issues relating to facility itself.[20]  (*Id.* at 55–57.)  As to the MDC, where Panos spent just two weeks before he was transferred to the Otisville Camp, Panos claims he was barred from

---

[19] In his Motion, Panos relies on *United States v. Van Putten*, 726 F. Supp. 3d 245, 257–58 (S.D.N.Y. 2024), (Mot. 63), in which the court granted a reduction after considering the prisoner's exemplary disciplinary record and extensive rehabilitation efforts. There are many reasons to distinguish that case from this one.  In *Van Putten*, the defendant had served nineteen years of a life sentence and the court found that a combination of factors justified early release. *Id.* at 259.  These factors included: the sentencing court's reliance upon its mistaken belief about the frequency of life sentences; the defendant's especially harsh sentence as compared to his accomplices' sentences; the defendant's rehabilitation while incarcerated despite serving a life sentence without any promise of release; and the defendant's young age at the time of the crime. *Id.* at 247–48.  It also found a reduction was consistent with the policy statements in § 1B1.13, including, among other things, that the defendant was not a danger to the safety of the community and the sentencing factors provided in 18 U.S.C. § 3553(a) weighed in favor of a reduction.  *Id.* at 252.  Missing in that case (among many other facts present here) was any suggestion of the defendant's participation in ongoing fraud, deceptive conduct toward the court, or refusal to accept responsibility. And, as will be discussed below, the § 3553(a) factors cut decidedly against Panos.

[20] As discussed in detail above, there is no evidence Panos contracted COVID at WCJ and his attorney's letter to the Court establishes otherwise.

bringing his legal papers from WCJ, was subject to lockdowns, was housed with a sex offender and violent criminals, and was denied visitation from his brother. (*Id.* at 57.)  Regarding the Otisville Camp, Panos complains about the condition of the physical facility, prison overcrowding, staff shortages, cancellation of visitations, limited movement during visitation days, frequent lockdowns, lack of various supplies, poor work conditions, and being served bad food. (*Id.* at 57–60.)   Panos also complains he has been threatened and assaulted and has witnessed violence. (*Id.* at 60–61.)  Based on these complaints, Panos argues that he has suffered an excessive amount of punishment.  (*Id.* at 61.)  The Court is unpersuaded.

To begin, as with many claims in his Motion, Panos has not provided sufficient corroboration for his allegations.[21]  As noted, the lack of corroborating evidence is significant here given the serious questions about Panos's credibility.  Beyond such concerns, the presence of harsh prison conditions—with exceptions such as physical or sexual abuse (which Panos does not allege), *see* U.S.S.G. § 1B1.13(b)(4)—is not included in the list of qualifying "extraordinary and compelling reasons" provided in Policy Statement 1B1.13.  Thus, Panos has to establish that the complained-of conditions are "similar in gravity" to the circumstances specifically set out as bases for relief, as noted in in Policy Statement 1B1.13(b)(5). *See* U.S.S.G. § 1B1.13(b)(5).  The extraordinary and compelling reasons listed in the Policy Statement include terminal illness, serious and chronic medical conditions, serious deterioration in physical or mental health due to aging, death or incapacitation of immediate family members, and sexual abuse or serious bodily

---

[21] For example, Panos submits certain food labels in support of his Motion.  (Panos's Ex. 128–32.)  However, there is nothing establishing the bone fides of these labels.  Panos offers no evidence explaining where he obtained these labels, when he obtained them, how many times the labels from the food he was served showed that the food was out of date, or even that Panos became sick from eating any of the food related to these labels.  Again, the Court is mindful that Panos has shown he is more than willing to submit fake documents to better his legal position. Thus, the Court attributes little weight to these labels.

injury committed by BOP or its agents. *See* U.S.S.G. § 1B1.13(b).  Yet, not a single one of the conditions that Panos asserts comes close to establishing anything that is "similar in gravity" to the listed circumstances. *See McCoy*, 2024 WL 1672363 at *5 (holding that allegations of mold, heating problems, understaffing, overcrowding, poor medical care, and units that were condemned did not rise to the level of extraordinary and compelling reasons warranting a reduction in sentence); *United States v. Feliz*, No. 16-CR-809, 2023 WL 8275897, at *6 (S.D.N.Y. Nov. 30, 2023) (holding that moving defendant failed to establish that alleged staffing shortages or other harsh conditions were "similar in gravity" to circumstances identified in U.S.S.G. § 1B1.13(b)); *accord United States v. Laureti*, No. 16-CR-60340, 2024 WL 5120516, at *7 (S.D. Fla. Dec. 16, 2024) ("Laureti's prior conditions of confinement may not serve as a basis for compassionate release as prison conditions are not one of the categories of extraordinary and compelling circumstances the Sentencing Commission has determined may support a reduced sentence.").

Panos's claim is rejected because his complaints about prison conditions, even if true, are not unusual or unique to him.  Indeed, it can hardly be said that being housed with violent inmates, enduring lockdowns, or having to deal with changes to the visitation schedule are unusual, let alone extraordinary.  Thus, they do not justify early release from prison.  *See United States v. Williams,* No. 17-CR-506, 2025 WL 3124670, at *3 (S.D.N.Y. Nov. 7, 2025) ("Williams . . . argues that his incarceration has been more 'punitive than intended' due to facility lockdowns, restricted visitation, and the general hardship of confinement during the COVID-19 pandemic.  However, such conditions do not rise to the level of extraordinary and compelling circumstances warranting early release." (citation omitted)); *United States v. Castagnetta*, No. 16-CR-770, 2024 WL 3952728, at *2 (S.D.N.Y. Aug. 26, 2024) ("While I do

not doubt that conditions in prison are hard and unpleasant, and while I do not mean to minimize the difficulty that the COVID-19 pandemic caused for inmates . . . any such . . . universal conditions do not give rise to extraordinary and compelling circumstances."); *United States v. Santana*, No. 12-CV-790, 2023 WL 2625790, at *4 (S.D.N.Y. March 24, 2023) ("The pandemic occasioned restrictions on visits, movement, and programming through the federal prison system . . . . However, generalized statements about prison conditions untethered to compelling specifics of the defendant's particular circumstances do not make the defendant's conditions 'extraordinary and compelling.'"); *Cekaj*, 2023 WL 4186050 at *1 (denying motion for compassionate release based on the defendant's age; conditions of confinement; medical conditions where the defendant had diabetes, high cholesterol, neurological disorder, vitamin D deficiency, chronic depression, former smoker status, chronic pancreatitis, obesity, and contracted of COVID-19 after vaccination with asserted long COVID; and changed family circumstances where defendant's eldest son passed away unexpectedly, leaving defendant's wife without financial and medical support for her osteoporosis).

C. Section 3553(a) Factors

Even if Panos had established that there were "extraordinary and compelling reasons" for early release, the Section 3553(a) factors strong counsel against early release. *See United States v. Mateo*, No. 17-CR-305, 2021 WL 2480171, at *2 (S.D.N.Y. June 16, 2021) (finding that, even if the defendant had demonstrated "extraordinary and compelling reasons," Section 3553(a) factors would outweigh those reasons where defendant had served less than half of his 120-month sentence); *United States v. Israel*, No. 05-CR-1039, 2019 WL 6702522, at *2 (S.D.N.Y. Dec. 9, 2019) (explaining that a court may deny a compassionate release motion if the court

determines that "Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances").

The Section 3553(a) factors that carry the most weight include the nature and circumstances of the offense; the history and characteristics of Panos; the need for the sentence imposed to reflect the seriousness of his offense conduct, the need to promote respect for the law, and to provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A). The Court also finds that the need to afford adequate general and specific deterrence to criminal conduct and the need to protect the public from further crimes weigh heavily in this case. *See id.* To be clear, *all* these factors plainly cut against Panos.

Panos's offenses were brazen, callous, calculating, and repetitive. He exploited his special knowledge as a doctor and medical practices to victimize large groups of patients and providers. It bears emphasizing that Panos has engaged in two separate fraudulent schemes. In the first, he caused his employer to submit fraudulent claims to health care providers for surgical procedures to which they were not entitled. (PSR ¶ 36.) The excess claims totaled $35 million and Panos and his employer were paid more than $13 million on claims to be submitted for Panos's supposed procedures. (*Id.*) In the second scheme, which began between his first sentencing and his reporting to prison, and resumed immediately after his release from prison, Panos wrote hundreds of reports rendering medical opinions for medical peer review companies. (*Id.* ¶¶ 10–17.) But, because he had lost his medical license, to carry out his second scam, Panos assumed the identity of another doctor. (*Id.* ¶ 10.) And, through shell companies and fake registered agents, Panos was able to make nearly $900,000 through years of lying and deceiving peer review companies and medical patients. (*Id.* ¶ 19.) In the end, while Panos has two fraud

convictions, he committed countless criminal acts in the course of the two fraudulent schemes for which he was convicted.

Panos's lies and fraudulent conduct did not end with the charged crimes. As described, he had his attorney submit falsified proposed trial exhibits to the Government and later, he falsely claimed he contracted COVID-19 and had yet another attorney submit falsified medical records to the Court to get his sentence adjourned. These acts plainly establish that Panos knows no bounds when it comes to doing or saying what, he thinks, could get him what he wants, whether it's money or freedom.

As the Court noted at sentencing, Panos's offense conduct in this case was more than annoying. Rather, his conduct had a major impact on others because it was a "monumental breach of trust" that was carried out "right after the case with Judge Román" and after Panos told Judge Román at sentencing that he was a "changed man." (App. Dkt. 51 at 110.) Panos's conduct breached the trust of the peer review companies that hired him, and the patients who believed their medical files were being evaluated by a licensed doctor. And, he did all of this while still under court supervision from his conviction before Judge Román.

Regarding Panos's personal history and characteristics, they are, as the Court noted at sentencing, "fertile ground for aggravation." (*Id.* at 105.) While Panos claimed at sentencing that his crimes were the result of his naïveté, the Court stated then, and believes even more now, that Panos's special skill is to "[take] advantage of other people who [are] too trusting," (*id.* at 105–06), which he uses to "exploit[] opportunities and . . . probe[] for a weakness in other people's ability to not just trust[,] but ability to find out when maybe their trust shouldn't be placed somewhere," (*id.* at 107). And what was true at sentencing is still true today: The record reveals "one example after another of Mr. Panos taking different shots and just trying to pull the

52

wool over everybody's eyes, including this Court." (*Id.* at 107.)  In the end, the Court imposed the sentence it did because Panos's personal history is one of endless lies and deception, including while under court supervision, which, in the Court's view, had no peer in the Court's many years of imposing sentences.  (*Id.* at 112–13 ("I've rarely seen anything like this in all my years in the criminal justice system.").)

To be clear, Panos's personal history is not frozen in time.  It is a moving picture.  There has been no stop to Panos's attempts to manipulate those around him and the criminal justice system in general.  He committed the offense conduct here both after promising Judge Román that his days of fraud were over and within days of release from the prison sentence that Judge Román imposed.  And, as has been noted many times, Panos tried to manipulate the trial's outcome by creating fake exhibits, tried to delay sentencing by falsely claiming to be suffering from COVID, and has tried to gain early release here by lying about his medical condition and the care being provided to him by prison officials.

To be blunt, Panos has been a fake doctor as long as he ever was a real one, (*see* PSR ¶ 70), and he offers not a shred of evidence that he has seen the error of his ways.  Thus, the notion that the last three years of imprisonment has been enough to deter him from future misconduct is beyond any leap of faith.  It would, in fact, be succumbing to yet another act of deception.  Just as importantly, reducing his sentence from 102 months to just more than 36 months would disregard the seriousness of his criminal conduct and undermine respect for the law.  *See United States v. O'Berry*, No. 18-CR-277, 2024 WL 5244936, at *8 (S.D.N.Y. Dec. 30, 2024) (denying compassionate release where court found that reducing sentence would undermine the original reasons for sentence, including specific deterrence); *United States v. Teman,* No. 19-CR-696, 2024 WL 262781, at *10 (S.D.N.Y. Jan. 24, 2024) ("Teman's release

now, a little more than three months into service of a sentence for a brazen $333,000 fraud scheme, would disrespect the central factors of just punishment and promotion of respect for law."); *United States v. Graham*, No. 16-CR-786, 2023 WL 3222483, at *4 (S.D.N.Y. May 3, 2023) (denying compassionate release where defendant had "only served about half of her sentence" and "her early release would thereby undermine the sentencing goals"); *Henry,* 2020 WL 3791849 at *5 (concluding that early release was inappropriate under § 3553(a) given that the defendant committed serious criminal offenses, refused to accept responsibility, deflected personal responsibility, and on the grounds that a lower sentence would undermine respect for the law and jeopardize the public).  It also would be entirely inconsistent with the intent behind the original sentence—to punish Panos for the entirety of his criminal conduct.  Releasing him now would give him a free pass for the bulk of his misconduct.  And, it would only reward Panos for his deception in connection with this Motion and encourage him to engage in future fraud. Again, the Court believes now what it said at sentencing:  "Whether [Panos is] 54 or 64 or 74, [he] could continue to do stuff like this . . . . And given [his] propensity to just constantly lie and commit crimes and just defraud people, . . . there's a very serious issue here."  (App. Dkt. 51 at 111.)  Indeed, the 54-month sentence Judge Román imposed on Panos for his conviction for one count of health care fraud was not long enough to deter him from committing the three crimes in this case nor was it long enough to protect the public.  Letting Panos walk after just serving a little over 36 months of his sentence certainly is not long enough to deter Panos.

Thus, the Court concludes that consideration of the § 3553(a) factors weighs decisively against any sentence reduction.

### III.  Conclusion

For the foregoing reasons, the Court denies Panos's motion for compassionate release pursuant to 18 U.S.C. § 3582.  The Clerk of Court is respectfully requested to terminate the

pending motions at docket number 185 and docket number 211 and to mail this Opinion to Panos.

SO ORDERED.

Dated:    January 27, 2026
          White Plains, New York

_____
KENNETH M. KARAS
United States District Judge